641 A.2d 299

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Marshall Edwin LEET, Appellee.**

Supreme Court of Pennsylvania.

Argued March 9, 1993.

Decided May 4, 1994.

90

George R. Kepple, Dist. Atty., Bradley K. Hellein, Asst. Dist. Atty., Kittanning, for appellant.

Louis C. Long, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, PA, for Eugene L. Coon, Larry E. Kopko, Frank J. Policaro & The Sheriffs' Ass'n of the Com. of Pennsylvania.

Joseph F. Caruso, Chief Public Defender, Kittanning, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS and CAPPY, JJ.

*OPINION OF THE COURT*

FLAHERTY [1], Justice.

The issue is whether a deputy sheriff has authority in Pennsylvania to make a warrantless arrest for motor vehicle violations committed in his presence. The trial court held that he does not have such power to arrest, and suppressed evidence seized pursuant to what the court considered to be an illegal arrest. A divided Superior Court affirmed, 401 Pa.Super. 490, 585 A.2d 1033.

On May 17, 1988, while driving a marked sheriff's vehicle in Armstrong County, Deputy Sheriff Kevin Gibbons observed the vehicle driven by Marshall Leet pass a line of traffic stopped in a no passing zone. Gibbons directed Leet to pull off the road, approached the car, and observed an open can of beer on the front seat. He asked Leet to exit the car to perform a field sobriety test. Leet complied and successfully performed the test administered by Gibbons. Gibbons asked Leet for his papers, and Leet had no driver's license. Gibbons made a radio check of the status of Leet's driving privileges and was informed that Leet's license had been suspended. About this time, municipal police officer Donald Weber arrived on the scene to assist Gibbons.

With Leet's consent, Gibbons moved Leet's car to a safer parking place; while in the car, Gibbons saw a live round of .357 ammunition on the floor and two paper bags behind the front seat. Subsequently, marijuana was found in one of the paper bags, and methamphetamine was found in the tape deck. Officer Weber then issued citations for driving with an expired license, in violation of 75 Pa.C.S. § 1501; driving with an open can of beer, violating 75 Pa.C.S. § 3715; and passing in a no passing zone, a violation of 75 Pa.C.S. § 3307. Leet was subsequently charged with the additional offenses of unlawful possession of a controlled substance, and possession with intent to deliver a controlled substance.

In the trial court, Leet moved to suppress all physical evidence obtained by the police following Gibbons' allegedly

1. This opinion was reassigned to this author.

unauthorized stop and detention of Leet. The suppression court determined, after hearing, that Gibbons had lacked authority to stop Leet for a traffic violation, and suppressed the evidence.

The lower courts both concluded that when Gibbons stopped Leet, administered field sobriety tests, and detained Leet while the sheriff radioed for a license status report, Leet was in custody. We agree. Leet's freedom was sufficiently restricted, and Leet's reasonable perception that his freedom had been removed was sufficient to establish that he was in custody. *Commonwealth v. Lagana*, 517 Pa. 371, 537 A.2d 1351 (1988).

■ The lower courts also concluded that Gibbons, whether or not authorized to stop Leet, was acting under color of law, so that state action is implicated and suppression of evidence was appropriate if the stop was illegal. We agree. *See Commonwealth v. Corley*, 507 Pa. 540, 491 A.2d 829 (1985); *Commonwealth v. Eschelman*, 477 Pa. 93, 383 A.2d 838 (1978).

■ In addressing the question whether a sheriff may enforce the motor vehicle code as Gibbons did, the Superior Court treated the issue as one of statutory interpretation. The court reasoned that 75 Pa.C.S. § 6308(a) places a duty on motorists to ·exhibit their vehicle registration and driver's license upon request *only* when requested by a "police officer," a designation which does not include the sheriff or his deputies. The court also recited dozens of provisions of the motor vehicle code which refer to the powers and duties of "police officers" in the control of traffic and· vehicles. The court rejected the argument of the Commonwealth that, on the basis of the common law, "sheriffs and deputy sheriffs have inherent power and authority to arrest without a warrant for all crimes, however, committed in their presence, including Vehicle Code violations." The court reasoned that "an attempt to imply power where the same has not been granted by statute would be in direct violation of the legislature's mandate that sheriffs and deputy sheriffs shall perform the duties imposed by statute."

We hold, however, that the common law powers of the sheriff include the power to enforce the motor vehicle code, and that such powers have not been abrogated by statute or otherwise.

History records that, even prior to the Conquest, the sheriff was a powerful officer, with both judicial and executive powers. Lady Doris M. Stenton, in her historical masterwork *English Justice Between the Norman Conquest and the Great Charter: 1066–1215* (1964), provides many details of the powers and duties of the sheriff. The work deals entirely with civil and ecclesiastical law to the exclusion of criminal law, though mention is made of enforcing "the peace of the sheriff" as well as "the peace of the king." *Id.* at 79; *The Earliest Lincolnshire Assize Rolls,* case 542, pp. 95–96. The sheriff nonetheless played a central role in the English civil courts from before the Norman Conquest until the Magna Carta; the sheriff was, at the beginning of the period, "a great local lord." Stenton, *English Justice: 1066–1215,* at 80. Prior to the Conquest and in the decades immediately thereafter, the sheriff was more akin to a judge than a law enforcement officer, *id.* at 48, 55, 74, sheriffs serving at times as appellate judges, *id.* at 57. Then, in the gradual development of an official judicial class, pleas of the crown began to be removed from the jurisdiction of the sheriff and to be heard by a local justiciar in each shire. *Id.* at 65–67. Thus, in the civil realm, at least, the sheriff's role evolved from that of judge to that of court officer with authority "to summon suitors to the court, to collect amercements from defaulters and carry out the judgments of the court." *Id.* at 67. Throughout the period 1066–1215, sheriffs were "men with powerful local connections," *id.,* and often, indeed, with powerful royal connections, *id.* at 80, 163, 171, 175.

Despite other historians' claims that the sheriff assumed "the air of the errand boy of the royal courts," Lady Stenton asserts that such a conclusion "is hardly fair" and "is surely an exaggeration." Rather, "[t]he thirteenth-century sheriff was the head within his shire of a complex system of local government centered on the county town, often on the royal castle,

and employing an undersheriff and a large staff of bailiffs or serjeants and clerks." *Id.* at 80. Even in the enforcement of court orders, the sheriff was no "errand boy," but was authorized and expected to employ often-necessary force. "Many of the early writs ... are addressed to the sheriff ordering him to restore the complainant to seisin." *Id.* at 80–81. The procedure replaced the Anglo–Saxon "self-help" remedy, and, in those far-off days, frequently involved the occurrence or risk of violence. *Id.* at 22–24. *See also id.* at 171–172. Even late in the period,

> many writs [authorized] the sheriff to act on the king's behalf in a judicial or an executive capacity.... The number and variety of the *justices* and viscontiel writs directed to the sheriff increased with the increasing volume of business in the royal courts held before justices itinerant. The very word *justices* implies that the sheriff in obeying such writs was acting through the shire court as a judge in the modern sense. In obeying many viscontiel writs he was certainly acting in an executive capacity only, but it must have been difficult for a hard-pressed sheriff to be mindful of the distinction. But whether the suitors of the shire court were giving judgment in a case brought by one of their number by plaint, or the sheriff was acting on a *justicies* writ, or was leading the *posse comitatus* without writ to force a lord to replevy plough-beasts, all these pleas were part of the sheriff's work in the shire court.

*Id.* at 81–82; *see* T.F.T. Plucknett, *A Concise History of the Common Law* (5th ed., London, 1956), p. 92. Mention should also be made of the Assize of Clarendon, 1166 A.D., which clearly establishes the sheriff's power to arrest in criminal cases.[2]

---

**2.** The Assize of Clarendon states in part:

And when a robber or murderer or thief, or harbourers of them, shall be taken on the aforesaid oath, ... the sheriffs shall send word to the nearest Justice through some intelligent man, that they have taken such men; and the Justices shall send back word to the sheriffs where they wish those men to be brought before them; and the sheriffs shall bring them before the Justices....

And the sheriffs who take them shall lead them before the Justice without other summons than they have from him. And when the

It is a commonplace that in times going back to the Magna Carta, the sheriff was the chief law enforcement officer of the shire or county. Pollock and Maitland, in their opus *The History of English Law*, provide the following enlightenment:

> The law of arrest is rough and rude; it is as yet unpolished by the friction of nice cases. Before we say more of it we must call to mind two points in our criminal procedure. In the first place, any preliminary magisterial investigation, such as that which is now-a-days conducted by our justices of the peace, is still in the remote future, though the coroners are already making inquest when there is violent death.... Secondly, there is no professional police force. *The only persons who are specially bound to arrest malefactors are the sheriff, his bailiffs and servants* and the bailiffs of those lords who have the higher regalities.

Pollock and Maitland, *The History of English Law: Before the Time of Edward I,* Cambridge, Boston, 2d ed., Vol. II, at 582 (1899) (emphasis added.) Though it may be unnecessary to cite additional authority, Blackstone confirms the common law power of the sheriff to make arrests without warrant for felonies and for breaches of the peace committed in his presence. Blackstone, *Commentaries on the Common Law,* Vol. IV, at 289. Indeed, such powers are so widely known and so universally recognized that it is hardly necessary to cite authority for the proposition. To make the point, how few children would question that the infamous Sheriff of Nottingham had at least the authority to arrest Robin Hood.

> robbers or murderers or thieves, or receivers of them, who shall be taken through the oath or otherwise, are given over to the sheriffs, they also shall receive them straightway without delay....
>
> And if any sheriff shall send word to another sheriff that men have fled from his county into another county on account of robbery or murder or theft, or the harbouring of them, or for outlawry, or for a charge with regard to the forest of the king, he (the sheriff who is informed) shall capture them; and even if he learn of it himself or through others that such men have fled into his county, he shall take them and keep them in custody....

Henderson, Ernest F., trans. and ed., *Select Historical Documents of the Middle Ages,* pp. 17–19, Biblo and Tannen: New York (1965).

 Unless the sheriff's common law power to make warrantless arrests for breaches of the peace committed in his presence has been abrogated, it is clear that a sheriff (and his deputies) may make arrests for motor vehicle violations which amount to breaches of the peace committed in their presence. Thus, we search the statutes for authority abrogating the common law power of the sheriff, rather than statutory authority for the sheriff to enforce the law—authority he has always possessed under common law. In other words, although the Superior Court searched in vain for a provision which grants the sheriff an enforcement power under the motor vehicle laws, it is instead necessary to search for a statutory provision which removes the enforcement power of the sheriff (which pre-existed the statute). The latter search is equally vain; there is, in the motor vehicle code, no unequivocal abrogation of the sheriff's common law power to arrest. It is evident, moreover, that the power to arrest subsumes the power to stop, detain, and investigate a motorist who breaches the peace while operating a motor vehicle in the presence of the sheriff.

In short, it is not necessary to find a motor vehicle code provision granting to sheriffs the power to enforce the code— sheriffs have had the power and duty to enforce the laws since before the Magna Carta; rather, it would be necessary to find an unequivocal provision in the code abrogating the sheriff's power in order to conclude that the sheriff may *not* enforce the code.[3]

 It has been argued that to protect public safety, anyone who enforces the motor vehicle laws should be required to undergo training appropriate to the duties. It is certainly within the proper function of government and in keeping with the realities of the modern world to require adequate training

---

**3.** The issue of the status of a sheriff or deputy sheriff in labor relations law, specifically under Act 111, 43 P.S. § 217.1 et seq., is not presented in this case. Whether a sheriff is a "policeman" entitled to compulsory binding arbitration under Act 111, as addressed in *Venneri v. County of Allegheny*, 12 Pa.Cmwlth. 517, 316 A.2d 120 (1974), is a question not determined by the sheriff's arrest powers and is a question we do not address in this case.

of those who enforce the law with firearms. Policemen, to whom the legislature has given primary responsibility for enforcement of the motor vehicle code,[4] are required by statute to undergo formal training prior to enforcing the law.[5] We deem this requirement to apply equally to sheriffs who enforce motor vehicle laws. Thus a sheriff or deputy sheriff would be required to complete the same type of training that is required of police officers throughout the Commonwealth.

As the record is incomplete in this respect, we must remand the case for a finding as to whether deputy sheriff Gibbons had completed appropriate law enforcement training, and for further proceedings consistent with this opinion.[6]

Case remanded.

Mr. Justice LARSEN did not participate in the decision of this case.

Senior Justice MONTEMURO, who was an appointed justice of the court at the time of argument, did not participate in the consideration or decision of this case.

Mr. Justice CAPPY concurs in the result.

Mr. Chief Justice NIX files a dissenting opinion.

NIX, Chief Justice, dissenting.

I agree with the majority that Leet was in custody when Deputy Sheriff Gibbons stopped him, administered field sobriety tests, and detained him while checking the status of his driver's license. I also agree that Gibbons, regardless of his authorization to stop Leet, was acting under color of law so that state action is implicated and suppression of evidence is

4. *See* 75 Pa.C.S. § 6304.

5. *See* "Act 141," or "Municipal Police Jurisdiction Act," 42 Pa.C.S. § 8951 et seq., and "Act 120," or "Municipal Police Officers' Education and Training Act," 53 P.S. § 741 et seq.

6. We are aware of the Deputy Sheriff's Education and Training Act, 71 P.S. section 2101, et seq. which will be considered by the fact finder in the determination of whether appropriate law enforcement training has been completed.

appropriate if the stop is illegal. I cannot, however, accept the conclusion of the majority that the common law powers of the sheriff include the power to enforce the Motor Vehicle Code.

The office of the sheriff has its basis in the Pennsylvania Constitution. Pa. Const. art. 9 § 4 ("County officers shall consist of ... sheriffs ... and such others as may from time to time be provided by law."). The Constitution neither explains nor provides any duties for the sheriff. The General Assembly, however, has recently enacted legislation that provides some guidance.

Under "[a]n Act clarifying the powers of constables, county detectives, sheriffs, deputy sheriffs, waterways patrolmen and game protectors," the General Assembly limited the sheriff's powers and duties to those "authorized or imposed upon them by *statute*." Act of June 29, 1976, P.L. 475, No. 121, § 1, (codified as amended at 16 P.S. § 1216) (emphasis added). Chapter 29 of the Judicial Code imposes the duty on the county sheriff or his deputy to "serve process and execute orders directed to him pursuant to law." 42 Pa.C.S. § 2921. The General Assembly has not conferred upon the office of sheriff or his deputies the authorization to make warrantless arrests for violations of the law. In contrast, such authority has been granted to other law enforcement officials.

The Motor Vehicle Code empowers uniformed state police officers to arrest any person who violates the Motor Vehicle Code in the state police officer's presence. It also permits all other police officers to arrest any non-resident who violates the Motor Vehicle Code in the police officer's presence. 75 Pa.C.S. § 6304.[1]

1. Section 6304, entitled "Authority to arrest without warrant," provides:

 (a) Pennsylvania State Police.—A member of the Pennsylvania State Police who is in uniform may arrest without a warrant any person who violates any provision of this title in the presence of the police officer making the arrest.

 (b) Other police officers.—Any police officer who is in uniform may arrest without a warrant any nonresident who violates any provision of this title in the presence of the police officer in making the arrest.

The initial motor vehicle violation in this case is improper passing which is governed by Chapter 33 and is designated by Chapter 65 of the Motor Vehicle Code as a summary offense. Therefore, the most likely place to find the sheriff's authorization to arrest the defendant is the Motor Vehicle Code. There is no such authority for any arrest under the specific chapter governing the rules of the road. Thus, it is governed by Chapter 63 which expressly authorizes only state police officers and other police officers to make arrests under the Motor Vehicle Code. I am therefore constrained to conclude that sheriffs and their deputies are not authorized to make arrests under the Motor Vehicle Code.

The majority concludes that "a sheriff (and his deputies) may make arrests for motor vehicle violations which amount to breaches of the peace committed in their presence." Op. at 303. However, our criminal code does not recognize the crime of the breach of peace. Conduct does not constitute a crime unless it is a crime under Title 18 or another statute of this Commonwealth. 18 Pa.C.S. § 107(b). The closest offense to a breach of peace that can be found in the statute is disorderly conduct which is prohibited by section 5503 of the Crimes Code. 18 Pa.C.S. § 5503. The Commonwealth did not establish the elements of disorderly conduct at the suppression hearing. Therefore, at the time that Deputy Sheriff Gibbons first instructed Leet to pull over, Leet had committed no offense other than improper automobile passing. Nonethe-

(c) Other powers preserved.—The powers of arrest conferred by this section are in addition to any other powers of arrest conferred by law. 75 Pa.C.S. § 6304(a)-(c).

The Motor Vehicle Code makes several references to sheriffs *and* police officers, thus denying the Commonwealth's argument that a sheriff is a police officer for the purposes of the Motor Vehicle Code. *See* 75 Pa.C.S. § 3102 ("No person shall willfully fail or refuse to comply with any lawful order or direction of any *uniformed police officer, sheriff* ... authorized to direct, control or regulate traffic.") (emphasis added); 75 Pa.C.S. § 6309(d) ("The *police officer's,* constable and *sheriff's* costs ... shall be recoverable in addition to costs of prosecution.") (emphasis added). It cannot be legitimately argued that police officers and sheriffs are different entities in these sections of the Motor Vehicle Code but are identical for the purposes of effectuating arrests under section 6304.

less, the majority somehow elevates this summary traffic offense into a breach of the peace.

Accordingly, because the legislature has not expressly granted to sheriffs the power to make warrantless arrests for violations of the Motor Vehicle Code, I am constrained to conclude that such a decision is not within the province of this Court's authority. In my view, the common law powers of the sheriff have been abrogated by statute and, on that basis, I respectfully dissent.