**[J-109-2019] [MO: Saylor, C.J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 48 MAP 2019 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 383 MDA |
| | : | 2018 dated December 7, 2018 |
| v. | : | Affirming the Judgment of Sentence |
| | : | of the Adams County Court of |
| | : | Common Pleas, Criminal Division, |
| VICTOR LEE COPENHAVER, | : | at No. CP-01-CR-0001070-2015 |
| | : | dated September 18, 2017. |
| Appellant | : | |
| | : | ARGUED: November 21, 2019 |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE WECHT**                                                    **DECIDED: April 22, 2020**

I join the Majority's straightforward and important holding "that driving a vehicle with an expired registration does not entail a breach of the peace." Maj. Op. at 8. I write separately to address three topics.

First, whereas the Majority remands this case to the Superior Court, I would instead resolve the matter here. The Majority directs the Superior Court to determine "whether the parties' factual stipulation should be read as indicating that the officer's understanding that the registration sticker was associated with a different vehicle arose in the pre-stop timeframe . . . ." *Id.* Based upon the record before us, I would rule that the stipulation does not create such an understanding.

Second, even assuming that a court should interpret the parties' stipulation in the manner that the Commonwealth proposes, driving with a registration sticker belonging to

another vehicle would not amount to a breach of the peace under the Majority's own definition.

Finally, I believe that our decision in *Commonwealth v. Leet*, 641 A.2d 299, 303 (Pa. 1994) (holding that "a sheriff (and his deputies) may make arrests for motor vehicle violations which amount to breaches of the peace committed in their presence," even in the absence of any authorizing statute), should be overruled, given its flawed logic and this Court's continued struggle to outline the contours of sheriffs' common law arrest powers.

Below, I take up each point in turn.

I

The Commonwealth maintains that it was before stopping Copenhaver that Deputy Sheriff Timothy Beall discovered that the registration sticker on Copenhaver's vehicle actually belonged to another vehicle. The Majority states that this is "consistent with the Commonwealth's position throughout this litigation." Maj. Op. at 8. While the Commonwealth may have advanced this view consistently, at least at the appellate level,[1] it is a position inconsistent with the actual record facts of the case.

---

[1] Notably, Deputy Beall, the arresting officer, testified at trial that he pulled over Copenhaver only because the registration sticker had expired, and that he learned that the registration belonged to another vehicle only after stopping Copenhaver. *See* Notes of Testimony ("N.T."), 7/12/2017, at 14 ("During the traffic stop, we did receive information back from our dispatcher that not only was the tag expired as the sticker displayed, the tag which was on the truck did not even go to the truck, nor was it a truck tag, if I remember correctly."); *id.* at 20 (responding, "That is correct" to a question asking, "Your report notes that you then pulled [Copenhaver] over for that expired registration sticker; is that correct?"); *id.* at 24 (stating that "that's the reason we kept following him is we were waiting on the dispatcher to confirm that the tag was in fact expired"). The Assistant District Attorney also argued to the trial court that Deputy Beall pulled over Copenhaver only for an expired registration. *See id.* at 52 ("[Deputy Beall] testified that . . . he did not observe any Vehicle Code violations other than the expired registration").

In the affidavit of probable cause, attached to the initial criminal complaint, Deputy Beall, the arresting officer and only witness at Copenhaver's trial, attested that he and Deputy Sheriff Angel Garcia "were in uniform, operating an unmarked patrol vehicle," when they noticed "a gray Dodge Truck traveling westbound in front of them." Affidavit of Probable Cause, 9/3/2015, at 1 ("Beall Affidavit"). Deputy Beall stated that "[f]urther examination revealed the tag had an expired [registration] sticker." *Id.* After the truck made another turn, the "Deputies stopped the vehicle for the violation." *Id.*

The next paragraph of the affidavit establishes that it was only after Deputy Beall "approached the driver," after Deputy Beall "advised [Copenhaver] why he was stopped and asked [him] to produce his license," after Copenhaver told Deputy Beall that he had a suspended license, after Deputy Beall "could smell an odor of marijuana . . ., as well as a strong odor of an alcoholic beverage," after Deputy Beall noted Copenhaver's "bloodshot eyes and slurred speech," and after Copenhaver told Deputy Beall that "he had an outstanding arrest warrant," that Deputy Beall did proceed to "check[] Mr. Copenhaver's information via the dispatcher" and then learned that "the registration displayed on the truck came back to a 2001 Pontiac," not the Dodge truck that Copenhaver was driving. *Id.*

Copenhaver filed a motion to suppress the evidence resulting from the search of his vehicle, arguing that he had not committed a breach of the peace and that Deputy Beall thus could not have made the stop under a sheriff's common law authority. Copenhaver asserted only that Deputies Beall and Garcia "noticed that [Copenhaver's] vehicle registration tag had expired," citing the Incident Report which contained language identical to that in the Beall Affidavit. Copenhaver's Motion to Suppress at ¶ 2. Copenhaver went on to write that "[a]s a result of the expired tag, the sheriffs effectuated a traffic stop." *Id.*

But then a funny thing happened on the way to the (judicial) forum. The suppression court issued an order reporting that the parties agreed to a set of stipulated facts, including the following:

> The vehicle stop occurred as a result of the deputy sheriff observing the tailgate to the pickup truck operated by [Copenhaver] being in a down position. This caught his attention. He further observed that the registration on the pickup truck was expired, *and additionally, the registration number was identified as belonging to a vehicle other than the one on which it was attached.*

Order of Stipulated Facts, 1/12/2016, at ¶ 2 (emphasis added).

> Our standard of review for an order denying suppression is well-settled:

> When we review the ruling of a suppression court we must determine whether the factual findings are supported by the record. When it is a defendant who has appealed, we must consider only the evidence of the prosecution and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. Assuming that there is support in the record, we are bound by the facts as are found and we may reverse the suppression court only if the legal conclusions drawn from those facts are in error.

*Commonwealth v. Hicks*, 208 A.3d 916, 925 (Pa. 2019) (citation omitted). Additionally, for the purpose of reviewing the suppression court's determination, we restrict ourselves—correctly so—to the record at the time of that ruling. *Commonwealth v. Frein*, 206 A.3d 1049, 1064 (Pa. 2019) (citing *In re L.J.*, 79 A.3d 1073, 1085 (Pa. 2013)).

Less established, however, is how a reviewing court must assess a situation in which the parties dispute the meaning of a stipulated fact. The very definition of "stipulation" opposes the notion of a dispute. *See Stipulation*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A voluntary agreement between opposing parties concerning some relevant point; esp., an agreement relating to a proceeding, made by attorneys representing adverse parties to the proceeding."). However, as the Majority notes, the parties disagree here as to whether the set of stipulated facts meant only that Deputy Beall, before stopping Copenhaver's vehicle, had observed that the registration sticker

was expired, or, rather, that Deputy Beall additionally observed at that juncture that the registration belonged to a different vehicle. *See* Maj. Op. at 2–3.

When the parties dispute the meaning of a "stipulated" fact, it is prudent to read that fact in the light most favorable to the party who prevailed in the suppression court, "[a]ssuming that there is support in the record" at the time of the suppression hearing for such an interpretation. *Hicks*, 208 A.3d at 925. Even under such a standard, nothing in the record suggests that Deputy Beall knew—before he stopped Copenhaver—that the registration belonged to another vehicle. The language in Deputy Beall's affidavit, which comprises the totality of the factual record before the court at the time of the suppression motion (aside from the disputed stipulation), is clear. After stopping Copenhaver's vehicle and speaking with Copenhaver,

> Deputy Beall checked Mr. Copenhaver's information via the dispatcher and it was learned that Mr. Copenhaver's driver's license had expired (9-30-1993) and the warrant was active. Additionally, the registration displayed on the truck came back to a 2001 Pontiac and was verified as expired.

Beall Affidavit at 1.[2] Thus, there is no "support in the record," *Hicks* 208 A.3d at 925, as of the time the suppression motion was filed, to allow for the Commonwealth's position.[3]

---

[2] Read in isolation, the language of the Order of Stipulated Facts could support either perspective. It is possible to read the phrase "[h]e further observed" in the second sentence as modifying both "that the registration on the pickup truck was expired" and "additionally, the registration was identified as belonging to a vehicle other than the one on which was attached." Conversely, it is possible to read "[h]e further observed" as only modifying the first phrase—the reference to the expired registration. Indeed, the final phrase is written in the passive voice; "the registration number was identified" as belonging to the 2001 Pontiac. Deputy Beall did not necessarily *himself* identify that the registration belonged to another vehicle. Consistent with the Beall Affidavit, the stipulation should be read as meaning that another party, the dispatcher, identified the registration mismatch. And, as Deputy Beall noted in the affidavit, he did not hear from the dispatcher until after he learned Copenhaver's identity, which did not occur until after Deputy Beall stopped the vehicle.

[3] I do not dispute that it is possible for a law enforcement officer to know that a registration sticker belongs to another vehicle before stopping a driver. While

The stipulation cannot be read to indicate that Deputy Beall knew about the registration mismatch before he stopped Copenhaver's vehicle. Thus, there is no need to remand that particular issue to the Superior Court.

Additionally, the manner in which the Commonwealth ran with those stipulated facts, and the trial court's response, deserve comment. In its brief opposing Copenhaver's motion to suppress, the Commonwealth stated repeatedly that Deputy Beall observed that the registration belonged to another vehicle. *See* Commonwealth's Memorandum of Law in Support of Sheriff Deputy Authority to Conduct Traffic Stop ("Commonwealth's Suppression Brief"), 1/26/2016, at 1–2 ("Deputy Beall conducted a vehicle stop after observing . . . that the registration displayed on the truck was expired and actually belonged on a different vehicle."); *id.* at 2 ("Deputy Beall had the authority to conduct a traffic stop of [Copenhaver's] vehicle after observing [Copenhaver] . . . with a displayed registration that belonged on a vehicle other than the one [Copenhaver] was operating."); *id.* at 4 ("Here, we have a traffic stop occurring after Deputy Beall noticed that Copenhaver was operating a pick-up truck . . . that had an expired registration sticker. Further, Deputy Beall determined that the registration that was displayed on Copenhaver's truck belong to a different vehicle altogether. Based upon those observations, Deputy Beall conducted a traffic stop of Copenhaver's vehicle."); *id.* at 5 ("Deputy's Beall's traffic stop . . . followed . . . the display of a registration that belonged

---

Copenhaver was on bail, pending appeal of this case, he again was stopped for allegedly driving under the influence. On September 21, 2018, Gettysburg Borough Police Department Officer Shannon Hilliard noticed a Jeep parked behind a stop sign. Before stopping the vehicle, Officer Hilliard "ran the registration to find that it was registered to a 2010 Cougar trailer, not a Jeep." Affidavit of Probable Cause, 12/22/2018, at 1. Only after running this registration did Officer Hilliard attest that she attempted to pull over Copenhaver. *Id.*; *see also* Commonwealth's Motion to Revoke Bail at ¶ 5 (noting that Officer Hilliard "was attempting to pull [Copenhaver] over for an improper registration number"). Unlike Officer Hilliard, Deputy Beall never stated that he ran the registration number through a database before attempting to stop Copenhaver's vehicle.

on another vehicle."). At no point did the Commonwealth cite to the factual record, or even to the stipulated facts, for support of any of these statements.

Most stridently, the Commonwealth posited that the registration belonging to another vehicle endangered public safety:

> In addition to posing a safety risk to the public by not being properly registered, the display of a registration upon a vehicle to which it does not belong constitutes a breach of the peace because it can hide the true identity of the vehicle and its operator, specifically whether the vehicle is stolen and whether the driver is a fugitive from justice. Displaying a registration upon the wrong vehicle can also serve to conceal other countless acts of criminal activity constituting a breach[] of the peace, such as drug trafficking, human trafficking, illegal transport or possession of firearms, etc. Actions to conceal such behavior, *i.e.*[,] displaying an improper registration upon a vehicle, disturb public order and amount to breaches of the peace.

*Id.* at 5–6. The Commonwealth cited nothing from the record that indicated that Copenhaver used a vehicle registration to commit or attempt theft, drug trafficking, human trafficking, or illegal transport or possession of firearms. And the Commonwealth cited no legal authorities, professional publications, or other sources to support its claim that, in general, operating a vehicle with a registration belonging to another vehicle is calculated to facilitate the commission of or increase the likelihood of any such crimes.

The trial court denied the motion to suppress in a one-paragraph order, citing our decisions in *Leet* and *Commonwealth v. Marconi*, 64 A.3d 1036 (Pa. 2013). However, in its Pa.R.A.P. 1925(a) opinion, the trial court elected to adopt the position that the Commonwealth took in its Suppression Brief. After opining that the stipulated facts meant that "Sheriff Deputy Beall initiated a traffic stop because he observed that the registration on [Copenhaver's] vehicle was not only expired but also belonged to a different vehicle," Trial Court Opinion Pursuant to Pa.R.A.P. 1925(a), 11/20/2017, at 5 ("Trial Ct. Rule 1925(a) Op."), the court wrote that "[a]rguably, the vehicle could have been stolen, which is certainly a breach of the peace. Therefore, Sheriff Deputy Beall had the authority to

conduct a vehicle stop for a violation of the Motor Vehicle Code," *id.* at 5–6. Like the Commonwealth, the trial court cited no facts in the record nor any support from any legal or professional authority in general to support the conclusory assumption that a mismatched registration meant that the vehicle "could have been stolen." Any number of things could have been true, and great many things are always possible. But adjudication requires proof. It cannot rely upon bootstrapping.

While critiques of our adversarial system abound, "'the worst and most unjust system is assuredly . . . an adversary system which weighs the scales, contrary to its fundamental premises, in favor of the prosecution.'" *Commonwealth v. Coley*, 351 A.2d 617, 628 n.20 (Pa. 1976) (Roberts, J., dissenting) (quoting ALEXANDER BICKEL, THE MORALITY OF CONSENT 82 (1975)). Our trial courts, especially when acting as factfinders, have the right, even the duty, to weigh the parties' arguments. However, a trial court should not adopt wholesale a party's assertion when that assertion is not supported by any legal or factual authority. When a "claim[] has [not] been developed beyond . . . unsupported assertions," a court "will not develop the claims for" that party. *Commonwealth v. Cotto*, 753 A.2d 217, 224 n.6 (Pa. 2000). This truism is applicable to unsupported arguments advanced by defendants and prosecutors alike. *See Commonwealth v. Sherwood*, 982 A.2d 483, 507 n.34 (Pa. 2009); *Commonwealth v. Fant*, 465 A.2d 1245, 1247 (Pa. 1983) (Flaherty, J., dissenting).

It was error here for the trial court to adopt via opinion the Commonwealth's bald assertion that Copenhaver's "vehicle could have been stolen" based upon mismatched registration, Trial Ct. Rule 1925(a) Op. at 5, an assertion that the court then in turn deployed to support its breach of the peace rationale. There is no accusation that the trial court arrived at its conclusion out of ill will towards Copenhaver. Nonetheless, by adopting the Commonwealth's unsupported argument, in a written opinion meant to aid

the Superior Court upon appeal, the trial court implicitly "weigh[ed] the scales . . . in favor of the prosecution." *Coley*, 351 A.2d at 628 n.20 (Roberts, J., dissenting) (citation and quotation marks omitted). This transgressed a core tenet at the heart of our adversarial system: the principle that our trial courts act as neutral arbiters, impartially evaluating the parties' arguments for credibility and persuasiveness in order to arrive at a just outcome. As the Supreme Court of the United States stated recently in the context of administrative law, "[i]f judicial review is to be more than an empty ritual, it must demand something better" than "an explanation for . . . [an] action that is incongruent with what the record reveals." *Dep't of Commerce v. New York*, __ U.S.__, 139 S. Ct. 2551, 2575–76 (2019). In this instance, the trial court failed to "demand something better" than the Commonwealth's bald assertions involving a litany of crimes that Copenhaver was never accused of committing.

## II

But let us assume for a moment that the stipulated facts could be interpreted as meaning that Deputy Beall somehow knew that the registration belonged to another vehicle before he stopped Copenhaver.[4] Even in such a scenario, the Majority's own definition of "breach of the peace" precludes a finding that a mismatched registration would amount to a breach of the peace.

Citing trial court opinions from our own Commonwealth, precedent from our sister states, and a law review article, the Majority determines that "a breach of the peace arises from an act or circumstance that causes harm to persons or property, or has a reasonable

---

[4]    In its brief to this Court, the Commonwealth, again, without any legal, factual, or record citation, asserted that "[a]s a result" of learning that the registration belonged to another vehicle, "Deputy Beall had information leading to a reasonable conclusion that the vehicle might be stolen at a time prior to the traffic stop." Commonwealth's Brief at 15.

potential to cause such harm, or otherwise to provoke violence, danger, or disruption to public order." Maj. Op. at 7–8.[5] The Majority rightly concludes that, for crimes against persons, the accused conduct must be "a violent or dangerous action" or must "lead to public disorder." *Id.* at 8.

It is difficult to imagine how a registration sticker belonging to another vehicle constitutes a "violent or dangerous action" or "lead[s] to public disorder." Just as driving with a registration sticker showing that the vehicle's registration has expired "does not tend to incite violence, disorder, public or private insecurity, or the like," *id.*, neither does driving with a registration sticker that does not match the vehicle upon which it sits. The average resident driving on our Commonwealth's roads or strolling on our Commonwealth's sidewalks would not believe that a mismatched registration sticker on a nearby vehicle (assuming that the average resident might somehow notice such defect[6]) is a violent action being committed against other members of the public. It is

---

[5] To extent that the Majority includes harm to property, I believe that it is unnecessary to reach that issue here. While it is conceivable that certain property-related crimes could constitute breaches of the peace, it is also easy to imagine *de minimis* property violations which would not amount to breaches of the peace. Sweeping in all property crimes could raise constitutional questions about notice and vagueness. *Cf. Commonwealth v. Duda*, 923 A.2d 1138, 1147 (Pa. 2007) ("The due process void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.") (quotation marks omitted); *Wright v. Georgia*, 373 U.S. 284, 293 (1963) (concluding that the conviction of six defendants, who protested racial discrimination by playing basketball in a segregated public park, violated due process because "it [could] not be maintained that petitioners had adequate notice that their conduct was prohibited by the breach of the peace statute").

[6] The Pennsylvania Department of Transportation does not even issue registration stickers anymore. *See* 75 Pa.C.S. § 1332(d) ("Validating registration stickers shall not be issued or required to be displayed."); Pennsylvania Department of Transportation, *Effective 12/31/16, PennDOT will no longer issue Vehicle Registration stickers*,

inconceivable that the act of driving with the wrong sticker, in and of itself, disrupts the public order.[7]  If it does, we have opened the door to law enforcement interventions in all manner of circumstances in which no one would claim to discern a breach of the peace.

### III

Since our Nation's founding, this Commonwealth's Constitutions have recognized the office of county sheriff.  *See* PA. CONST. of 1776, Frame of Government, §§ 19, 31; PA. CONST. of 1790, art. II, § 8, art. VI §§ 1, 3; PA. CONST. of 1838, art. VI, §§ 1, 4; PA. CONST. of 1874, art. III, § 7, art. XIV, §§ 1, 4, amend. of Nov. 6, 1945; PA. CONST. art. IX, § 4.  Curiously, however, while our Constitution mentions the existence of the county sheriff, its text does not assign or specify any duties of that office.  *See* PA. CONST. art. IX, § 4 ("County officers shall consist of . . . sheriffs . . . .").  Twenty-six years ago, this Court confronted the question of whether a sheriff could, even in the absence of statutory authority, arrest an individual who has committed a breach of the peace.  *See Leet*, 641 A.2d at 300.  Though the majority opinion failed to note the aforementioned constitutional provision, the Court, after reviewing the history of the sheriff at common law, simply declared that "[u]nless the sheriff's common law power to make warrantless arrests for breaches of the peace committed in his presence has been abrogated, it is clear that a sheriff (and his deputies) may make arrests for motor vehicle violations which amount to breaches of the peace committed in their presence," as long as the sheriff (or her

---

Title/Registration, https://www.dmv.pa.gov/VEHICLE-SERVICES/Title-Registration/Pages/Registration-Stickers.aspx (last visited Feb. 24, 2020).

[7]    As noted above, while the trial court imagined that a mismatched sticker led to an inference of theft, unless the individual accused of breaching of the peace is actually committing that theft in a violent way that harms (or threatens to harm) another person, such speculation is improper in determining that the registration belonging to another vehicle is a breach of the peace.

deputies) "complete[d] the same type of training that is required of police officers throughout the Commonwealth." *Id.* at 303. And that was that.

*Leet* was flawed at the time it was decided, and the past twenty-six years have underscored these flaws, revealing that *Leet*'s framework is untenable. It is time to overrule that precedent, and it is time for our General Assembly to define the duties of our Commonwealth's sheriffs.

## A

As an initial matter, the Majority concludes that overruling *Leet* "is beyond the scope of the question presently before this Court." Maj. Op. at 6 n.4. The question on which we granted *allocatur* was limited to determining whether "an expired vehicle registration tag constitutes a 'breach of the peace.'" *Commonwealth v. Copenhaver*, 215 A.3d 970 (Pa. 2019) (*per curiam*). However, in his Pa.R.A.P. 1925(b) statement, Copenhaver claimed that "Deputy Beall lacked any authority to detain [Copenhaver] for an expired registration tag in the absence of express legislative authority," without referencing whether the expired registration amounted to a breach of the peace. Copenhaver's Concise Statement, 11/16/2017, at ¶ 1. Citing then-Chief Justice Nix's dissent in *Leet*, Copenhaver also seemed to argue in his Superior Court brief, *see* Copenhaver's Brief, 383 MDA 2018, at 12–14, his *allocatur* petition, *see* Petition for Allowance of Appeal, 13 MAL 2019, at 9–12, and his Supreme Court brief, *see* Copenhaver's Brief, 48 MAP 2019, at 10–13, that sheriffs should not have the authority to arrest for any Motor Vehicle Code violations.

It is true that "'we are limited to the issues as framed in the petition for allowance of appeal.'" Maj. Op. at 6 n.4 (quoting *Commonwealth v. Metz*, 633 A.2d 125, 127 n.3 (Pa. 1993)). However, as we have previously stated:

> [W]e cannot look the other way simply because to abrogate prior precedent
> in the process of resolving this case is more than Petitioners have asked us

to do. We would encourage the perpetuation of poorly reasoned precedent were we to permit ourselves to revisit the soundness of our case law only when expressly invited to do so based upon a given party's tactical decision of whether to attack adverse case law frontally (always a gamble against long odds) or to attempt more finely to distinguish the adverse decisions. The scope of our review is not so circumscribed.

*William Penn Sch. Dist. v. Pa. Dep't of Educ.*, 170 A.3d 414, 446 n.49 (Pa. 2017). In this instance, both the *allocatur* petition and Copenhaver's brief argued that *Leet* should be overturned, as the Majority acknowledges. *See* Maj. Op. at 6 n.4 ("[Copenhaver] also argues that deputy sheriffs should not be authorized to effectuate traffic stops based on supposed common law powers."). We can and should reach the issue of whether *Leet* should be overturned notwithstanding Copenhaver's "tactical decision" not to include *Leet* in the language of the *allocatur* question.

**B**

The Framers of our Commonwealth's and our Nation's Constitutions had a conception of law somewhat different from our own. For them, the common law simply existed, waiting to be revealed by the "brooding omnipresence in the sky." *S. Pac. Co. v. Jensen*, 244 U.S. 205, 222 (1917) (Holmes, J., dissenting). But our Framers' beliefs about "the source of natural justice"[8] made way over time for the view that "'law in the sense in which courts speak of it today does not exist without some definite authority behind it,'" *Erie R.R. CO. v. Tompkins*, 304 U.S. 64, 79 (1938) (quoting *Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co.*, 276 U.S. 518, 533 (1928) (Holmes, J., dissenting)). Today's conception of common law "is rooted in a positivist mindset utterly foreign to the American common-law tradition of the late 18th century." *Sosa v. Alvarez-Machain* 542 U.S. 692, 745 (2004) (Scalia, J., concurring in part and concurring in the judgment).

---

[8] *See* Anthony J. Sebok, *Misunderstanding Positivism*, 93 Mich. L. Rev. 2054, 2062 (1995).

The brooding-omnipresence-versus-positivist-authority debate played out most prominently on the civil side of our common law jurisprudence, especially in the area of general common law and federal diversity jurisdiction. *See Erie*, 304 U.S. 64. However, when our Commonwealth adopted English common law in 1777, *see Commonwealth v. Ladd*, 166 A.2d 501, 502–03 (Pa. 1960), we not only adopted the common law of torts and contracts and property, but the common law of crime as well, *see, e.g.*, *Republica v. Newell*, 3 Yeates 407, 414–16 (Pa. 1802) (applying the common law of perjury in a criminal case). Into the twentieth century, we continued to adjudicate criminal common law. *See Commonwealth v. Mochan*, 110 A.2d 788, 790 (Pa. 1955) ("In a number of States[,] and especially in the common law State of Pennsylvania[,] the common law of England, as to crimes, is in force except in so far [*sic*] as it has been abrogated by statute."). However, in 1972, in line with the modern positivist trend, our General Assembly codified the criminal laws of this Commonwealth. In doing so, the General Assembly decreed: "Common law crimes abolished.--No conduct constitutes a crime unless it is a crime under [Title 18 of Pennsylvania's Consolidated Statutes] or another statute of this Commonwealth." Act of 1972, Pub. L. 1482, No. 334, § 107(b) (effective June 6, 1973) (codified as 18 Pa.C.S. § 107(b)). Thus, the Commonwealth can no longer bring common law charges against defendants. Rather, Pennsylvania prosecutors must look to the "definite authority," *Erie*, 304 U.S. at 79 (citation and quotation marks omitted), of a statute duly enacted by our General Assembly.

## C

In enacting the criminal code, the General Assembly elected not to codify the common law crime of "breach of the peace." *See* Commonwealth's Brief at 13 ("As [Copenhaver] aptly highlights, the Common Law crime of Breach of the Peace is no longer viable following the adoption of the Crimes Code."). Additionally, neither the criminal code

nor the Motor Vehicle Code ("MVC") empowers sheriffs to enforce their provisions. This is not because the General Assembly is incapable of identifying in legislation which of our law enforcement personnel can enforce our statutes. Police officers have the authority to make warrantless arrests for violations of the criminal code, *see* 42 Pa.C.S. § 8902, and municipal police officers are specifically empowered to enforce that same code, *see* 42 Pa.C.S §§ 8952–8953. State police officers and "[o]ther police officers" are empowered to make arrests for violations of the MVC. 75 Pa.C.S. § 6304.

Nor is the General Assembly incapable of defining the sheriff's duties. On the contrary. By my count, the word "sheriff" appears in over 400 statutory provisions. Most importantly, "sheriffs . . . shall perform all those duties authorized or imposed on them by statute." 13 P.S. § 40; *see also* 42 Pa.C.S. § 2921 ("The sheriff, either personally or by deputy, shall serve process and execute orders directed to him pursuant to law."). In line with this generic grant of authority, the General Assembly has empowered our Commonwealth's sheriffs to perform all sorts of specific tasks. A sheriff can make an arrest for the violation of a protection from abuse order committed in the sheriff's presence. 23 Pa.C.S. § 6113(a). A sheriff can apprehend an individual who has been charged with an offense under the Uniform Code of Military Justice, pursuant to a court-martial's warrant. 51 Pa.C.S. § 5201(e). A sheriff can investigate disputes about the custody of animals, 3 Pa.C.S. § 2315, search for gunpowder in homes within the City of Philadelphia, 53 P.S. § 16567, serve process on islands between Pennsylvania and New Jersey, 71 P.S. § 1815, remove stocks of illegal fireworks, 72 P.S. § 9415, and issue licenses for dealers of precious metals, 73 P.S. § 1932. Even within the confines of the MVC, a sheriff can direct that a vehicle be impounded for nonpayment of fines, 75 Pa.C.S. § 6309, and conduct public sales for impounded vehicles, 75 Pa.C.S. § 6310(b). Also within the MVC, drivers are ordered to obey a sheriff who is directing traffic, 75 Pa.C.S.

§ 3102, and a sheriff's vehicle is permitted to have flashing lights, 75 Pa.C.S. § 4571. And yet, with all of these specific provisions giving various duties to sheriffs, including within the MVC itself, never did the General Assembly decree that sheriffs should have the general authority to enforce the laws of our Commonwealth, criminal or motor vehicle in nature.[9]

As a matter of law, this lack of statutory authorization should have been the end of this debate. Then-Chief Justice Nix, the sole dissenter in *Leet*, thought it was. Citing what is now codified as 13 P.S. § 40 ("[S]heriffs . . . shall perform all those duties authorized or imposed on them by statute."), then-Chief Justice Nix wrote, simply, that "[t]he General Assembly has not conferred upon the office of sheriff or his deputies the authorization to make warrantless arrests for violations of the law. In contrast, such authority has been granted to other law enforcement officials[, and t]here is no such authority [for the sheriff] for any arrest under the specific chapter governing the rules of

---

[9]  In contrast to Pennsylvania, where sheriffs rely for their general arrest power only upon common law authority developed and pronounced by this Court, other states specifically empower their sheriffs through statute to make arrests, including for breaches of the peace. *See, e.g.*, ARIZ. REV. STAT. ANN. § 11-441(A)(2) ("The sheriff shall . . . [a]rrest and take before the nearest magistrate for examination all persons who attempt to commit or have committed a public offense."); CAL. GOV'T CODE § 26601 ("The sheriff shall arrest and take before the nearest magistrate for examination all persons who attempt to commit or who have committed a public offense."); FLA. STAT. § 30.15(1)(g) ("Sheriffs . . . shall . . . [a]pprehend, without warrant, any person disturbing the peace . . . ."); IND. CODE § 36-2-13-5 ("The sheriff shall (1) arrest without process persons who commit an offense within the sheriff's view, take them before a court of the county having jurisdiction, and detain them in custody until the cause of the arrest has been investigated; (2) suppress breaches of the peace, calling the power of the county to the sheriff's aid if necessary . . . ."); MONT. CODE ANN. 7-32-2121 ("The sheriff shall . . . arrest and take before the nearest magistrate for examination all persons who attempt to commit or have committed a public offense . . . ."); OHIO REV. CODE ANN. § 311.07(A) ("Each sheriff shall preserve the public peace and cause all persons guilty of any breach of the peace, within the sheriff's knowledge or view, to enter into recognizance with sureties to keep the peace and to appear at the succeeding term of the court of common pleas, and the sheriff shall commit such persons to jail in case they refuse to do so."). I can imagine nothing disabling our own General Assembly from passing similar laws if it chooses to do so.

the road," *i.e.*, the MVC.  *Leet*, 641 A.2d at 304 (Nix, C.J., dissenting).  Thus, "because the legislature ha[d] not expressly granted to sheriffs" the power to make arrests for MVC violations that amounted to breaches of the peace, then-Chief Justice Nix was "constrained to conclude that such a decision is not within the province of this Court's authority" and that "the common law powers of the sheriff ha[d] been abrogated by statute."  *Id.* at 305 (Nix, C.J., dissenting).  Notwithstanding its unquestionable power to do so, the General Assembly has chosen not to alter our statutory framework with regard to sheriffs since Chief Justice Nix dissented in 1994.  The dissent was convincing then, and it is convincing now.  It should be the law.

### D

While *Leet* was incorrect when it was decided, the experience of this Court since then in attempting to apply that precedent has shown even more clearly that we should overrule the decision.[10]  In 2007, Justice Baer, writing for the Court, declared that "[f]or the fifth time in the past fifteen years, this Court is called upon to clarify the breadth of county sheriffs' authority to investigate, cite, and arrest those who break the law." *Commonwealth v. Dobbins*, 934 A.2d 1170, 1171 (Pa. 2007) (footnote omitted).  Since 2007, we have twice again been called upon to clarify our county sheriffs' authority.  *See* Maj. Op. at 1; *Marconi*, 64 A.3d 1036.

With one exception, *see Commonwealth v. Hock*, 728 A.2d 943 (Pa. 1999) (recognizing that "fighting words" can be prohibited, notwithstanding the First Amendment, if those words constitute a breach of the peace), the only time this Court

---

[10]     This is not the first criticism of *Leet* since it was decided.  *See Marconi*, 64 A.3d at 1041 (calling *Leet* "not a fully-reasoned" decision); *id.* at 1041 n.5 (writing that *Leet* "offer[s] little account for the derivation of [the difference between English sheriffs and American sheriffs] or developmental and historical nuances associated with the evolving role of peace officers"); *but see id.* at 1042 n.7 ("We have acknowledged that *Leet* could have been a better developed opinion . . .; however, there is a salutary aspect in that some of the deficiencies are offsetting in relation to others.").

ever even gives content to the term "breach of the peace" is when we adjudicate our sheriffs' (or constables') authority. *See Marconi*, 64 A.3d 1036; *Dobbins*, 934 A.2d 1170; *Kopko v. Miller*, 892 A.2d 766 (Pa. 2006); *Lockridge*, 810 A.2d 1191; *Commonwealth v. Roose*, 710 A.2d 1129 (Pa. 1998); *Leet*, 641 A.2d 299. The Majority's own definition of breach of the peace is compelled to rely upon a trial court decision from 1930, a law review article citing early American history, and decisions from sister states, the most recent of which is from 1991. *See* Maj. Op. at 6–7.

The Majority strives mightily to create a more precise meaning of breach of the peace, possibly in the forlorn hope that our lower courts will be able to adjudicate future cases without our recurrent intervention. Past experience of this Court suggests that this exercise will prove fruitless. The six cases preceding Copenhaver's appeal have failed to provide authoritative guidance. *See Marconi*, 64 A.3d at 1041 n.5 ("*Leet*'s loose incorporation of undefined peacekeeping powers as the rational litmus for determining sheriffs' current authority under the Vehicle Code has yielded substantial uncertainties in the jurisprudence."); *cf. Atwater v. City of Lago Vista*, 532 U.S. 318, 327 n.2 (2001) (avoiding having to define breach of the peace, but writing that "[t]he term apparently meant very different things in different common-law contexts" and "[e]ven when used to describe common-law arrest authority, the term's precise import is not altogether clear"). That we continually have felt bound to grant *allocatur* on this issue over the past quarter century is a testament to the impossibility of defining the term with precision. The General Assembly clearly is better-suited to such a task.

Our continued failure to squarely define breach of the peace does no favor to either sheriffs or average residents of (and visitors to) Pennsylvania. When a sheriff is traveling in an official vehicle and witnesses an individual disobeying some provision of the MVC, that sheriff will have to decide, on a moment's notice, whether the observed action is a

breach of the peace. While we rely upon our law enforcement officers to know the law and their duties in enforcing the law, requiring a sheriff to interpret when a particular action is a breach of a peace (and to know simultaneously whether the sheriff has the necessary training, as judicially-decreed in *Leet*) seems beyond the pale, considering that even the judges and justices of this Commonwealth cannot come to an agreement.

Perhaps even more troubling is the lack of notice given to those Pennsylvanians who may violate the MVC. The average resident, who likely has less legal training than a law enforcement officer, will have no idea whether driving over an "unprotected hose of a fire department," 75 Pa.C.S. § 3708, parking forty-nine feet from a railroad crossing, 75 Pa.C.S. § 3353(a)(3)(i), or crossing a highway in a golf cart at a forty-five degree angle, 75 Pa.C.S. § 77A01(b)(1), constitutes a breach of the peace, for which a sheriff passing by could make an arrest. Even if such an action does not constitute a breach of the peace, the sheriff, as an arresting officer who "has probable cause to believe that [the] individual has committed even a very minor criminal offense in his presence," can arrest that individual without violating the Fourth Amendment. *Atwater*, 532 U.S. at 354. And while the arrestee, under the Majority's approach, may hope later to have the fruits of that arrest suppressed and the charges thrown out, the arrestee will nonetheless "join the 65 million Americans with an arrest record and experience the 'civil death' of discrimination by employers, landlords, and whoever else conducts a background check." *Utah v. Strieff*, __ U.S. __, 136 S. Ct. 2056, 2070 (2016) (Sotomayor, J., dissenting).

A sheriff using these common law powers of arrest granted by this Court has enormous discretion. Because law enforcement resources are not unlimited, discretion is a necessary element in our criminal justice system. But as the law stands, sheriffs have discretion not only in determining who may be arrested and for what crimes they may be arrested, but also in determining (at least until court review following a suppression

motion) whether sheriffs themselves have the authority to make the arrest in the first place.

To make matters even worse, the *Leet* Court granted this authority after reviewing the history of the sheriff's power at common law, tracing that history back to England before the Norman Conquest of 1066. *See Leet*, 641 A.2d at 301–03. Reading *Leet*, one could be forgiven for thinking that the distinctly "powerful" role of the sheriff in law enforcement in medieval England, *id.* at 301, is the reason that Pennsylvania sheriffs today have the ability to make arrests for MVC violations that constitute breaches of the peace.[11] Nonetheless, in *Kopko*, this Court insisted that "the power of Sheriffs to arrest for crimes committed in their presence is no different from that of a private citizen." *Kopko*, 892 A.2d at 774. To be sure, older precedent has recognized that private citizens retain a common law arrest power. *See Commonwealth v. Chermansky* 242 A.2d 237 (Pa. 1968); *see also Commonwealth v. Corley*, 462 A.2d 1374, 1379 (Pa. Super. 1983) ("[W]e hold that a citizen's arrest can be made for a breach of the peace that is personally observed by the arrestor."); *aff'd on other grounds*, 491 A.2d 829, 834 (Pa. 1985) ("[W]e need not address the propriety of the Superior Court's holding that a citizen may arrest for a misdemeanor breach of the peace committed in his presence."). In an appropriate case, this quaint doctrine may be ripe for reexamination. *Cf.* Carol S. Steiker, *Second Thoughts About First Principles*, 107 HARV. L. REV. 820, 830–33 (1994) (noting that because professional police forces did not exist at the Founding, "ordinary citizens" served in law enforcement roles). For present purposes, suffice it is to say that there is

---

[11]     *See also Leet*, 641 A.2d at 303 ("Indeed, such powers are so widely known and so universally recognized that it is hardly necessary to cite authority for the proposition. To make the point, how few children would question that the infamous Sheriff of Nottingham had at least the authority to arrest Robin Hood.").

in practice a fundamental difference between a citizen's arrest and a sheriff's arrest, even if the two seizures rely theoretically upon the same legal source.

Let us imagine that an average driver failed to yield to an emergency vehicle leaving a garage. 75 Pa.C.S. § 3346. Another individual notices this action, pulls up next to the driver, and tells the driver that he or she is under arrest. Under *Leet* and *Kopko*, if failing to yield to an emergency vehicle exiting a garage were to constitute a breach of the peace, this individual (though a private citizen) legally could arrest the driver. The driver would likely laugh (or fight) at this notion, and would no doubt refuse to submit to such an "arrest."

Pursuant to *Leet* and its troubled progeny, when a sheriff makes an arrest for a MVC violation constituting a breach of the peace, the reaction from the driver should, in theory, be the same. But this is almost farcical. Where the sheriff is making the arrest, does anyone really believe that a rational driver would refuse to submit? Any answer but "no" is a legal fiction. "[N]o reasonable person[] would feel free to leave under such circumstances." *Commonwealth v. Cost*, __ A.3d __, 2020 WL 354975, at *15 (Pa. 2020) (Wecht, J., concurring).[12] A sheriff has a state-issued vehicle, a badge, a uniform, and a firearm. In other words, the sheriff is imbued with all the power of the state, a power that law-abiding citizens are bound to respect. And yet our law stubbornly pretends, per *Kopko*, that the sheriff is making an arrest legally indistinct from one that could be made by any private citizen. This is of course a sheer absurdity. Such dissonance only further epitomizes the underlying weakness of *Leet* and its progeny.

---

[12] *Cf. Commonwealth v. Price*, 672 A.2d 280, 284 (Pa. 1996) (rejecting that a citizen's arrest had occurred when an FBI agent attempted to arrest an individual for driving under the influence because it was "convincingly clear that" the agent "displayed conduct which can fairly be attributable to the state") (quotation marks omitted).

**E**

*Leet* was incorrect when it was decided, and it should be overruled. Since *Leet*, this Court's inability to give guidance to our lower courts, to our sheriffs, and to our residents has only further eroded the efficacy of that decision. This Court's fitful, episodic case-by-case common law approach to defining breach of the peace—an approach the General Assembly already had rejected when it abolished common law crimes—can never prove equal to the task of providing the necessary guidance. That is why we elect lawmakers.

I do not express an opinion on the ultimate question of whether it would be beneficial to have our Commonwealth's sheriffs enforce our criminal or motor vehicle laws. That is a policy question beyond my role as a jurist. To supply the answer to this question, we should look to that branch of government whose duty it is to define crimes, and whose processes allow for comprehensive regimes regarding enforcement of our laws: the General Assembly. The General Assembly could pass a statute empowering sheriffs to enforce specific provisions of the MVC or the criminal code, or the entirety of those codes. The General Assembly could define the exact training sheriffs must possess in order to enforce our criminal or motor vehicle laws.[13] We should stop beseeching the

---

[13] In *Leet*, we noted that police officers "are required by statute to undergo formal training prior to enforcing the law." *Leet*, 641 A.2d at 303 (citing 42 Pa.C.S. § 8951 *et seq.*). "We deem[ed] this requirement to apply equally to sheriffs who enforce motor vehicle laws." *Id.*; *see also Marconi*, 64 A.3d at 1046 (McCaffery, J., dissenting) ("[W]e also emphasized in *Leet* the need for appropriate training for sheriffs who are engaged in such law enforcement activities."). We have struggled to determine what constitutes appropriate training. *See Pa., Dep't of Transp., Bureau of Driver Licensing v. Kline*, 741 A.2d 1281, 1285–86 (Pa. 1999) (finding "that training other than Act 120 certification may be sufficient for purposes of Vehicle Code enforcement under our holding in *Leet*," but not declaring what exact training is required). The General Assembly has shown itself capable of creating comprehensive training requirements for sheriffs and their deputies. *See* Sheriff and Deputy Sheriff Education and Training Act, 71 P.S. §§ 2101–09. The legislature also could create necessary requirements if sheriffs were statutorily empowered to enforce the MVC.

"brooding omnipresence," *Jensen*, 244 U.S. at 222 (Holmes, J., dissenting), as we labor serially to define our sheriffs' role. We should rely instead upon that tried and true method for crafting the laws of our Commonwealth: bicameralism and presentment. Such a process not only conforms to the mandates of our Constitution but also would ensure legitimacy, precision, and finality in defining the important role that sheriffs are to play in our justice system.

Because I would resolve the dispute about the stipulated facts in this Court, I dissent from the Majority's decision to remand the case to the Superior Court. And while I agree that an expired registration tag does not amount to a breach of the peace, I would find that sheriffs do not possess the authority to stop drivers who violate the Motor Vehicle Code, absent a directive from the General Assembly.