2025 PA Super 29

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| STEVEN AHMAD WIGGS | : | |
| | : | |
| Appellant | : | No. 641 MDA 2023 |

Appeal from the Judgment of Sentence Entered April 3, 2023
In the Court of Common Pleas of Perry County Criminal Division at
No(s):  CP-50-SA-0000026-2021

BEFORE:  BOWES, J., STABILE, J., and MURRAY, J.

OPINION BY BOWES, J.:                    **FILED: FEBRUARY 6, 2025**

Steven Ahmad Wiggs appeals from the judgment of sentence of a $500 fine imposed after he was found guilty at a *de novo* trial of a summary offense for having red and blue lights on his personal vehicle, which he used while acting as a constable.  We affirm.

On June 15, 2021, Pennsylvania State Police ("PSP") Trooper Jacob Brown-Shields observed a "fully marked black and white [C]rown [V]ic[1] style

_____

[1] We note that the Crown Victoria Police Interceptor was the iconic police vehicle on the street and on the screen in the 1990s.  As explained in an article examining its importance in popular culture:

The *Times* recently reported that police departments are assigning officers the last of the Ford Crown Victorias, thereby signalling the end for one of law enforcement's most iconic vehicles.  Produced by Ford from 1979 to 2011, the heavyset sedan is beloved by police for its durability and muscle, and also, above all, for its hulking yet stealthy silhouette.  Anyone who has been pulled over in the past twenty years is self-trained in spotting an unmarked Crown Vic.  Its distinctive profile was so synonymous with the

*(Footnote Continued Next Page)*

constable vehicle" that was "equipped with a light bar on top." N.T. Summary Appeal, 4/3/23, at 7, 9. Having received a report of Appellant using a vehicle with red and blue lights a couple of weeks prior, Trooper Brown-Shields followed the vehicle, determined that it was registered to Appellant, and initiated a traffic stop. Appellant, who was armed and in a self-styled uniform, insisted multiple times that "constables are police officers" and he was "allowed to have red and blue lights." *Id*. at 9.

Since Appellant professed to being "embarrassed about being pulled over" as a constable, Trooper Brown-Shields permitted Appellant to turn on his lights. At a subsequent hearing, the trooper testified that he believed Appellant took him up on this offer, and that in doing so visually confirmed that the lights were red and blue. *Id*. Regardless of whether the lights were in fact activated, Appellant conceded that the lights were red and blue when he explained to Trooper Brown-Shields that the PSP had previously seized the same vehicle and cited Appellant for having red and blue lights on it. After the citation was dismissed for unknown reasons, the PSP returned the vehicle to Appellant with the red and blue lights intact. Despite the PSP asking him to remove the red and blue lights, Appellant told the trooper that he had

---

police that flashing lights became secondary. The mere sight of its outline was enough to frighten civilian drivers into compliance.

Sam Sweet, *The Crown Vic Jumps its Last Curb*, THE NEW YORKER, Sep. 3, 2013, *available at* https://www.newyorker.com/culture/culture-desk/the-crown-vic-jumps-its-last-curb. In the instant case, Appellant's black and white Crown Victoria had yellow striping, an image of the Pennsylvania coat of arms, and signage indicating "State Constable" and "Emergency 911." *See* Exhibit D-3.

refused to do so because he had won the case as to whether he could use such lights. *See* Exhibit D-2 at 7:45-9:08.

As will be discussed at length *infra*, the Vehicle Code specifies at 75 Pa.C.S. § 4571(b)(1) the types of vehicles permitted to have red and blue lights, which include police vehicles. Trooper Brown-Shields determined that Appellant's vehicle was not encompassed by the statute and cited Appellant for violating § 4571(b)(1). *See* N.T. Summary Appeal, 4/3/23, at 12-14. A Magisterial District Judge ("MDJ") found Appellant guilty and he appealed to the Perry County Court of Common Pleas. After litigating a pre-trial motion challenging the legality of the stop and the deletion of the trooper's mobile video recording prior to discovery, Appellant proceeded to a *de novo* trial. Trooper Brown-Shields testified, and Appellant introduced photographs of his vehicle and a twenty-two-minute audio recording he had made of the stop. At the conclusion, the court found Appellant guilty and imposed fines and the costs of prosecution.

This appeal followed. Appellant complied with the court's order to file a Pa.R.A.P. 1925(b) statement, and the court issued a Rule 1925(a) opinion addressing the issues raised by Appellant.[2] In this Court, Appellant has refined his arguments to the following four questions:

> A. Statutory Construction: Does the Statutory Construction Act lead to a holding that [Appellant]'s car was a "police vehicle,"

---

[2] We note that Appellant's requests for this case to be heard before another panel were denied.

- 3 -

as that two-word phrase is used in the applicable statute, 75 Pa.C.S. § 4571 (through its definitions section, § 102)?

B. Void for Vagueness Doctrine: If the two-word phrase "police vehicle" is interpreted as not including a constable's marked vehicle (of the particular type that is the subject of the instant case), does convicting a constable (convicting him of an offense for which having a "police vehicle" is a complete defense) cause a due process violation (as applied to that particular type of vehicle), under the "void for vagueness" doctrine, under either the Constitution of the Commonwealth of Pennsylvania and/or the Constitution of the United States of America?

C. Wrong Charge: When a person is convicted under the wrong subsection of a statute, is that conviction void?

D. No Evidence: When the color of the allegedly red[ and ]blue lights on a constable's police car is an essential element of the alleged offense, and when there is zero evidence of the color of the lights in a light bar which is off, is that conviction void?

Appellant's brief at 8 (cleaned up).

Appellant first challenges the court's interpretation of the Vehicle Code as prohibiting him from equipping his constable vehicle with red and blue lights.[3] His argument is simple: "A constable vehicle is a police vehicle; and a constable is a police officer." *Id*. at 11 (unnecessary capitalization omitted). Therefore, because police vehicles are permitted to have red and blue lights, he cannot be found guilty of a summary offense for having such lights.

_____

[3] Although we refer to Appellant's vehicle as a "constable vehicle," we are cognizant that the designation confers no particular status. ***See Commonwealth v. Rodriguez***, 81 A.3d 103, 108 & n.10 (holding that constables are not employees of the Commonwealth, and noting that their vehicles, which must be privately purchased and insured, are not government vehicles and therefore not exempt from the Vehicle Code's window tinting prohibitions). Rather, when we refer to a "constable vehicle" within this writing, we simply mean a private vehicle operated by an individual in his or her capacity as a Pennsylvania constable.

This issue requires us to interpret § 4571(b)(1) to determine whether Appellant was prohibited from having such lights, or whether he was authorized to utilize them on his constable vehicle. As this presents a question of law, our standard of review is *de novo* and our scope of review plenary. *See Vellon v. Dep't of Transportation, Bureau of Driver Licensing*, 292 A.3d 882, 890 (Pa. 2023) (cleaned up). Statutory interpretation is, of course, conducted in accordance with the Statutory Construction Act:

> Pursuant to that Act, "[t]he object of all statutory interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). When the words of a statute are clear and free from ambiguity, the letter of the statute is not to be disregarded under the pretext of pursuing its spirit. *Id*. § 1921(b). When, however, the words of a statute are not explicit, a court may discern the General Assembly's intent by examining considerations outside of the words of the statute. *Id*. § 1921(c). In addition, when construing a statute, we must, if possible, give effect to all of its provisions. *Id*. § 1921(a).
>
> The Statutory Construction Act also instructs that, in ascertaining the intention of the General Assembly in enacting a statute, several presumptions may be used. *Id*. § 1922. Among those presumptions is that "the General Assembly intends the entire statute to be effective and certain." *Id*. § 1922(2). We also may presume that the General Assembly does not intend absurd or unreasonable results. *Id*. § 1922(1). As this Court wisely stated over sixty years ago, to avoid such results, we "must read [statutes] in the light of reason and common sense." *Ayers v. Morgan*, 154 A.2d 788, 789 (Pa. 1959). [Further], we may presume that the General Assembly does not intend to violate the Constitution of the United States or this Commonwealth. 1 Pa.C.S. § 1922(3).

*Id*. at 890 (citations altered).

- 5 -

Pursuant to the maxim *expressio unius est exclusio alterius*, where "a section of a statute contains a given word, the omission of such word from a similar section of the statute shows a different legislative intent." ***Commonwealth v. Collins***, 286 A.3d 767, 774 (Pa.Super. 2022) (cleaned up). Stated another way, "[w]here a legislature includes specific language in one section of a statute and excludes it from another, that language should not be implied where excluded." ***Id***. (cleaned up). Finally, our legislature has directed that statutes that are *in pari materia*, *i.e.* "relate to the same persons or things or to the same class of persons or things[,]" must "be construed together, if possible, as one statute." 1 Pa.C.S. § 1932(a), (b).

With these principles in mind, we turn to the statute at issue in the case *sub judice*. Appellant was convicted of violating § 4571(b)(1) of the Vehicle Code, which provides as follows in pertinent part:

> **(a) General rule.--**Every emergency vehicle shall be equipped with one or more revolving or flashing red lights and an audible warning system. Spotlights with adjustable sockets may be attached to or mounted on emergency vehicles.
>
> **(b) Police, sheriff, fire and coroner or medical examiner vehicles.--**
>
> (1) Police, sheriff, coroner, medical examiner or fire police vehicles may in addition to the requirements of subsection (a) be equipped with one or more revolving or flashing blue lights. **The combination of red and blue lights may be used only on police, sheriff, coroner, medical examiner or fire police vehicles.**
>
> (2) Unmarked police and sheriff vehicles used as emergency vehicles and equipped with audible warning systems shall be equipped with the lights described in this subsection.

- 6 -

. . . .

**(d) Vehicles prohibited from using signals.--**Except as otherwise specifically provided in this section, **no vehicle other than an emergency vehicle may be equipped with revolving or flashing lights or audible warning systems identical or similar to those specified in subsections (a) and (b).** A person who equips or uses a vehicle with visual or audible warning systems in violation of this section commits a summary offense and shall, upon conviction, be sentenced to pay a fine of not less than $500 nor more than $1,000.

75 Pa.C.S. § 4571 (footnote omitted, emphases added). In § 102 of the Vehicle Code, our legislature defined "emergency vehicle" thusly:

A State or county emergency management vehicle, fire department vehicle, police vehicle, sheriff vehicle, ambulance, advanced life support squad vehicle, basic life support squad vehicle, emergency canteen support service organization vehicle, blood delivery vehicle, human organ delivery vehicle, hazardous material response vehicle, armed forces emergency vehicle, one vehicle operated by a coroner or chief county medical examiner and one vehicle operated by a chief deputy coroner or deputy chief county medical examiner used for answering emergency calls, a vehicle owned by or leased to a regional emergency medical services council that is used as authorized by the Department of Health to respond to an actual or potential disaster, mass casualty situation or substantial threat to public health, a vehicle owned by a county or regional police association and operated by a police officer that is used for police transport or victim extraction, a vehicle that is owned and operated by a county correctional institution in a city of the first class and used to respond to an emergency at a correctional institution in a city of the first class or to escort an ambulance which is transporting sick or injured prisoners in a city of the first class, any vehicle operated by a special agent, special agent supervisor, narcotics agent or narcotics agent supervisor while performing official duties as employees of the Office of Attorney General, any vehicle owned and operated by the Philadelphia Parking Authority established in accordance with 53 Pa.C.S. Ch. 55 (relating to parking authorities) and used in the enforcement of 53 Pa.C.S. Ch. 57 (relating to taxicabs and limousines in first[-]class cities), a vehicle owned by a city of the first class and operated by first judicial district

certified armed probation officers, a vehicle owned and operated by the Pennsylvania Turnpike Commission that is used by an emergency service responder as dispatched by the Pennsylvania Turnpike Commission's traffic operations center, or any other vehicle designated by the State Police under [§] 6106 (relating to designation of emergency vehicles by Pennsylvania State Police), or a privately owned vehicle used in answering an emergency call when used by any of the following:

    (1) A police chief and assistant chief.

    (2) A fire chief, assistant chief and, when a fire company has three or more fire vehicles, a second or third assistant chief.

    (3) A fire police captain and fire police lieutenant.

    (4) An ambulance corps commander and assistant commander.

    (5) A river rescue commander and assistant commander.

    (6) A county emergency management coordinator.

    (7) A fire marshal.

    (8) A rescue service chief and assistant chief.

    (9) The chief or operations director of a county hazardous materials response team.

    (10) A police officer who is also a member of a county or regional municipal special emergency response team which is authorized to respond to emergencies under 42 Pa.C.S. § 8953 (relating to Statewide municipal police jurisdiction).

75 Pa.C.S. § 102.

Patently, our General Assembly did not include private vehicles utilized by constables as one of the enumerated vehicles authorized to utilize red and blue lights within the text of § 4571 or in the definition of "emergency vehicle"

in § 102. Therefore, the plain language of the statute indicates that our legislature did not intend to permit constable vehicles to be equipped with such lights. **See Commonwealth v. Sanchez-Frometa**, 256 A.3d 440, 448 (Pa.Super. 2021) (cleaned up) ("Under the doctrine *expressio unius est exclusio alterius*, the inclusion of a specific matter in a statute implies the exclusion of other matters.").

Appellant nonetheless reasons that because a constable is a police officer, a constable vehicle must be considered a police vehicle, which is one of the vehicles that our General Assembly authorized to equip such lights pursuant to §§ 4571 and 102. Our review of the Vehicle Code dictates otherwise. Throughout the Vehicle Code, constables are deemed distinct from police officers as they are consistently listed separately. **See**, **e.g.**, 75 Pa.C.S. § 1376(b)(1), (5) (listing individually "[l]ocal police officers" and "[c]onstables or deputy constables" as those who may be delegated the authority to seize surrendered registration plates); 75 Pa.C.S. § 3102 (requiring compliance with the traffic direction of "any uniformed police officer, sheriff or constable"); 75 Pa.C.S. § 6309, 6309.1 (discussing impoundment by "police officer, sheriff or constable").

In line with the doctrine of *expressio unius est exclusio alterius*, "this Court has long recognized that as a matter of statutory interpretation, although one is admonished to listen attentively to what a statute says, one must also listen attentively to what it does not say." **Sanchez-Frometa**, 256 A.3d at 448 (cleaned up). Consequently, Appellant's equation of constables

with police officers in one part of the Vehicle Code, when they are treated separately in other *in pari materia* provisions, is contrary to *expression unius est exclusion alterius*. We cannot simultaneously give the General Assembly's distinction between constables and police officers credit and conclude that it neglected to list constable vehicles as one of the emergency vehicles because it implicitly considers constables as police officers. If that were true, there would be no need to list constables separately in §§ 1376(b), 3102, 6309, and 6309.1. Since we construe the entire statute to have meaning and the General Assembly to have not intended absurd results, we conclude that constable vehicles are not police vehicles.

Moreover, notwithstanding the insistence of Appellant and the dissent to the contrary, a constable vehicle cannot be included within the purview of a police vehicle because a constable simply is not a police officer. The term "police vehicle" is not defined within the statute, but we reasonably surmise that it is a vehicle equipped for use by a police officer. Section 102 of the Vehicle Code defines a police officer as "[a] natural person authorized by law to make arrests for violations of law."[4]  75 Pa.C.S. § 102.

---

[4] We note that this is but one definition our General Assembly has set forth for the phrase "police officer." The Crimes Code defines a "police officer" as "includ[ing] the sheriff of a county of the second class and deputy sheriffs of a county of the second class who have successfully completed the requirements under . . . the Municipal Police Education and Training Law ['MPETL')]." 18 Pa.C.S. § 103 (footnote omitted). The General Assembly elaborated on the definition of police officer in the MPETL as any of the following:

*(Footnote Continued Next Page)*

- 10 -

(1) A full-time or part-time employee assigned to criminal or traffic law enforcement duties of any of the following:

> (i) A police department of a county, city, borough, town or township.
>
> (ii) Any railroad or street railway police.
>
> (iii) Any campus or university police department, including the State System of Higher Education and its member institutions.
>
> (iv) The Capitol Police.
>
> (v) The Harrisburg International Airport Police.
>
> (vi) An airport authority police department.

(2) A deputy sheriff of a county of the second class.

(3) A security officer of a first class city housing authority or a police officer of a second class city housing authority.

(4) A county park police officer.

> The term excludes persons employed to check parking meters or to perform only administrative duties and auxiliary and fire police.

53 Pa.C.S. § 2162. Unlike the traditional understanding of a police officer, constables are not employed by police departments, or by any body for that matter, because they operate as independent contractors. ***See In re Act 147 of 1990***, 598 A.2d 985, 990 (Pa. 1991). Indeed, they are elected by the citizenry or appointed in the event of a vacancy. ***See*** 44 Pa.C.S. § 7111-7114.

More importantly, constables do not undergo the rigors of MPETL training. ***See*** 53 Pa.C.S. § 2167(a) ("All municipalities of this Commonwealth or groups of municipalities acting in concert and all colleges and universities shall be required to train all members of their police departments pursuant to this subchapter prior to their enforcing criminal laws, enforcing moving traffic violations under Title 75 (relating to vehicles) or being authorized to carry a
*(Footnote Continued Next Page)*

Our Supreme Court has interpreted this definition thusly:

[F]acially, the provision applies broadly to anyone with a power of arrest. **See** 75 Pa.C.S. § 102. Under the Statutory Construction Act, however, we presume that the General Assembly did not intend unreasonable results. **See** 1 Pa.C.S. § 1922. In this circumstance, a literal reading of the Vehicle Code's definition of "police officer" would invest enforcement authority in all citizens, in light of their common-law arrest power. ***See generally Commonwealth v. Chermansky***, 242 A.2d 237, 239–40 (Pa. 1968) (referencing the citizens' authority to arrest). It is manifest, however, that the Legislature did not intend to

_____

firearm."). The Municipal Police Officers' Education and Training Commission ("MPOETC") has mandated that aspiring police officers demonstrate certain physical fitness standards before entry into the training program. Once admitted, trainees undergo 919 hours of classroom and practical instruction, including forty hours on the operation of emergency vehicles and 124 hours on firearms. Additionally, a trainee must pass with a score of at least 80% various exams throughout the program, including a driving skills test, before being eligible to take the 200-question certification exam to become a police officer. **See** Physical Fitness, available at https://www.pa.gov/agencies/ mpoetc/programs/training/basic-police-officer-training/physical-fitness.html; Municipal Police Officer Basic Training Program, 2024, available at https://www.pa.gov/content/dam/copapwp-pagov/en/mpoetc/documents/ training/basic-police-officer-training/curriculum_overview_2024.pdf); MPOETC 2022 Basic Police Syllabus, available at https://www.pa.gov/content/ dam/copapwp-pagov/en/mpoetc/documents/training/basic-police-officer-training /basic%20police%20training%20syllabus.pdf.

Contrarily, constables undergo only eighty hours of basic training and forty hours of firearms instruction, with the requirement that they achieve a passing score of at least 70% on each written exam. **See** 44 Pa.C.S. § 7145 ("The Constables' Education and Training Program shall include training for a total of 80 hours, the content of which shall be determined by regulation. The training shall include instruction in the interpretation and application of the fees provided for in section 7161 (relating to fees).").; Constables' Education and Training, available at https://www.pa.gov/agencies/pccd/programs-and-services/training/public-safety-training/cetb-training.html. Therein, the only training pertinent to the use of a vehicle is four hours of instruction about prisoner transport and how to reduce the possibility of an escape. **See** Constables' Education and Training.

- 12 -

denominate the citizenry at large as "police officers" or confer vehicle-related enforcement authority upon it. Thus, we find that the Legislature's definitional reference to the authorization "by law to make arrests for violations of law," 75 Pa.C.S. § 102, refers to some form of legal authorization beyond a mere common-law power shared among Pennsylvania citizens.

*Commonwealth v. Marconi*, 64 A.3d 1036, 1041 (Pa. 2013) (citations altered).

"It is well settled that when vesting a group with police powers and duties, the Legislature does so with specificity." *Commonwealth v. Frombach*, 617 A.2d 15, 19 (Pa.Super. 1992) (cleaned up). Certainly, constables possess the authority to effect certain limited arrests:

> In addition to any other powers granted under law, a constable of a borough shall, without warrant and upon view, arrest and commit for hearing any person who:
>
> > (1) Is guilty of a breach of the peace, vagrancy, riotous or disorderly conduct or drunkenness.
> >
> > (2) May be engaged in the commission of any unlawful act tending to imperil the personal security or endanger the property of the citizens.
> >
> > (3) Violates any ordinance of the borough for which a fine or penalty is imposed.

44 Pa.C.S. § 7158.

Additionally, this Court has observed that "constables possessed the power at common law to make warrantless arrests for felonies and breaches of the peace." *Commonwealth v. Taylor*, 677 A.2d 846, 851 (Pa.Super. 1996). However, that arrest power was no greater than the "power exercised by [all] private citizens since antiquity," namely, "the power to make

warrantless arrests for felonies." *Id*. at 852. Hence, our ruling on the authority of constables to make certain arrests did not enlarge their power, but merely "avoid[ed] the anomalous situation of depriving constables of powers possessed by the ordinary citizenry." *Id*. (cleaned up); *see also* Peter J. Gardner, *Arrest and Search Powers of Special Police in Pennsylvania: Do Your Constitutional Rights Change Depending on the Officer's Uniform?*, 59 Temp. L.Q. 497, 536 (1986) ("Constables, however, do not possess general police powers and they have no statutory search powers. Despite their statutory arrest powers, their historical role as law enforcement officers, and the fact that they are more likely than private citizens to perform arrests and searches, some question exists whether police powers possessed by constables are any greater than the powers of private citizens." (footnotes omitted)).

Moreover, the statutory provisions governing constables confirm that constables are not synonymous with police officers. Section 7132 (Police Officers), sets forth the following pertinent conflict between the two positions:

> **(a) Constable employed as policeman not to accept other fees in addition to salary.**--Except for public rewards and legal mileage allowed to a constable for traveling expenses, and except as provided in subsection (b), it is unlawful for a constable who is also employed as a policeman to charge or accept a fee or other compensation, other than his salary as a policeman, for services rendered or performed pertaining to his office or duties as a policeman or constable.
>
> **(b) Exception.--**Unless prevented from doing so by the operation of 8 Pa.C.S. Ch. 11 Subch. J (relating to civil service for police and fire apparatus operators), borough policemen who reside in the

borough may hold and exercise the office of constable in the borough, or in any ward thereof, and receive all costs, fees and emoluments pertaining to such office.

44 Pa.C.S. § 7132 (footnote omitted). Clearly, and consistent with our interpretation of the Vehicle Code, the General Assembly views constables as **distinct** from police officers.

Based upon the foregoing, we hold that a constable is not a police officer. This holding is based in part upon our interpretation that the constable's limited arrest power is not equivalent to the arrest powers described within the definition of police officer in § 102 of the Vehicle Code. Indeed, the authority of constables is inconsistent with the unqualified arrest powers attributed to police officers in § 102. In point of fact, to include constables within that definition, we would need to read it as "authorized by law to make arrests **for certain** violations of the law." Such a broad interpretation would convert every citizen into a police officer, render every vehicle a police vehicle, and permit every private vehicle owned by a citizen to equip red and blue lights. *See Marconi*, 64 A.3d at 1041. Rather, a plain reading of "police officer" in § 102, in conjunction with the presumption that the General Assembly did not intend absurd results by its enactment, leads us to the conclusion that it means only those natural persons who have a general

- 15 -

authority to make arrests, *i.e.*, those employed as police officers by police departments.[5]  **See** 1 Pa.C.S. § 1922(1).

We would end our analysis here were it not for Appellant's insistence that the statute implicitly includes constable vehicles within the characterization of police vehicles based upon our Supreme Court's statement that "[t]he constable is a police officer" in **In re Act 147 of 1990**, 598 A.2d 985, 990 n.3 (Pa. 1991).  **See** Appellant's brief at 19.  Indeed, the learned dissent rests his writing upon that same allegedly "unequivocal" statement.  **See** Dissent at 1.  For the reasons that follow, we find this premise faulty.

First, it bears clarifying that the case from which this statement derives, **In re Act 147 of 1990**, did not touch upon the limited issue before us in this matter.  Rather, in that case, the issue was where constables belonged within our governmental system for purposes of oversight and accountability.  Our Supreme Court categorized constables as executive branch officials.  Because Act 147 had placed constables within the judicial hierarchy, the Court found Act 147 unconstitutional.

Second, the Court's statement that a "constable is a police officer" must be considered in context.  Notably, it appeared in a footnote as a reference to

---

[5] The dissent accuses us of improperly analyzing legislative intent despite a lack of ambiguity in the statutory language.  **See** Dissent at 5.  We reiterate that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the **intention** of the General Assembly."  1 Pa.C.S. § 1921(a) (emphasis added).  Presently, we discerned the General Assembly's intent not from an examination of the factors applicable to ambiguous language and set forth in § 1921(c), but from the plain language of the statute and the generally applied presumptions outlined by **Vellon** and § 1922.

the comic opera, the *Pirates of Penzance*. In full, the phrase relied upon by

Appellant and the dissent appears thusly:

> Simply stated, a constable is a peace officer.[3] A constable is a known officer charged with the conservation of the peace, and whose business it is to arrest those who have violated it. By statute in Pennsylvania, a constable may also serve process in some instances. As a peace officer, and as a process server, a constable belongs analytically to the executive branch of government, even though his job is obviously related to the courts. It is the constable's job to enforce the law and carry it out, just as the same is the job of district attorneys, sheriffs, and the police generally. Act 147 is unconstitutional and violates the separation of powers doctrine in our Constitution because it attempts to place constables within the judicial branch of government and under the supervisory authority of the judicial branch. . . . At most, constables are "related staff" under the Rules of Judicial Administration. They cannot, however, be made part of the judicial branch under our Constitution. To attempt to do so constitutes a gross violation of the separation of powers. Personnel whose central functions and activities partake of exercising executive powers cannot be arbitrarily made part of another branch of government whose functions they do not perform. To do so interferes with the supervisory authority of the Supreme Court just as much as attempting to dictate how that authority is to be exercised over personnel who are properly part of the judicial system. In consequence, we find Act 147 unconstitutional and invalid.
>
> _____
> [3] **The constable is a police officer.** It would perhaps not be remiss to recall Sir William S. Gilbert's famous line from *The Pirates of Penzance,* "When constabulary duty's to be done, to be done, a policeman's lot is not an 'appy one!"

*In re Act 147 of 1990*, 598 A.2d at 990 (cleaned up, emphasis added).

Despite determining that a constable cannot be placed within the

judiciary because that position constitutes an executive branch official, the

Court observed that "[a] constable is an elected official[,] . . . an independent

- 17 -

contractor[,] and is not an employee of the Commonwealth, the judiciary, the township, or the county in which he works." *Id*. at 986 (cleaned up). In other words, it is apparent that constables exist in a league of their own.

We do not extrapolate the High Court's footnote and operatic allusion to equate constables with police officers for all purposes, including in the definition of police officers in § 102 of the Vehicle Code. Instead, we heed the warning of our Supreme Court regarding "the necessity of reading legal rules—especially broad rules—against their facts and the corollary that judicial pronouncements should employ due modesty." *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 378 (Pa. 2014). Our High Court adopted "the principle that the holding of a decision is to be read against its facts" precisely because "it is very difficult for courts to determine the range of factual circumstances to which a particular rule should apply in light of the often myriad possibilities." *Maloney v. Valley Med. Facilities, Inc.*, 984 A.2d 478, 490-91 (Pa. 2009). In doing so, the Court echoed the sentiment of the Seventh Circuit Court of Appeals that "[j]udicial opinions are frequently drafted in haste, with imperfect foresight, and without due regard for the possibility that words or phrases or sentences may be taken out of context and treated as doctrines." *Id*. (cleaned up).

Consistent with this approach, we grappled with the import of *In re Act 147 of 1990*'s statement about the role of constables in *Taylor*:

> The Supreme Court's statement that "a constable is a peace officer" was merely express recognition of a well-settled legal principle. *See e.g.,* Black's Law Dictionary (5th ed. 1979)

(defining "peace officers" to include "sheriffs and their deputies, constables ... and other officers whose duty it is to enforce the peace."), and 6A C.J.S. Arrest, § 17 ("Justices, sheriffs, coroners, constables and watchmen are recognized peace officers at common law."). Lastly, 16 P.S. § 1216, Peace officers; powers and duties, expressly applies to constables.

Moreover, following its statement that "a constable is a peace officer", the Court inserted a footnote which provides, "[t]he constable is a police officer." *In re Act 147 of 1990*, 598 A.2d at 990. Instantly, the Commonwealth asserts that this statement constitutes Supreme Court recognition that constables possess "the same authorities and duties" as police officers under all circumstances. (Appellant's brief at 10.) We flatly reject this claim. Specifically, when read in the context in which it was uttered, the Court's statement indicates that the powers of constables and police officers are coextensive in matters relating to "conservation of the peace." *Id*. Further, as the remainder of the Court's Opinion indicates, its notation that "[t]he constable is a police officer" was intended as further support for the Court's ultimate conclusion that "a constable belongs analytically to the executive branch of government." *Id*. Therefore, since *Act 147* did not involve the relative arrest powers of constables and police officers, the Court's statement cannot be taken as a blanket endorsement of constable powers coextensive with those of police officers under all circumstances. Finally, the Court's finding that constables are independent contractors, as quoted above, clearly indicates that the Court did not consider constables and police officers analogous for all purposes, since Pennsylvania law has never characterized police officers as independent contractors.

*Taylor*, 677 A.2d at 847 n.6 (citations altered).

Stated simply, the *In re Act 147 of 1990* Court was not considering whether constables were police officers for purposes of the Vehicle Code. Rather, it was contemplating under which branch constables fell, and concluded that, as peace officers, they fell within the executive branch. As such, we will not take the footnote of *In re Act 147 of 1990* out of context

and extrapolate it to fit Appellant's desired outcome. *See Maloney*, 984 A.2d at 490.

While *In re Act 147 of 1990* certainly offers important background, our interpretation of the unambiguous language of the statute is confirmed by our Supreme Court's related decisions in *Commonwealth v. Leet*, 641 A.2d 299 (Pa. 1994), and *Commonwealth v. Roose*, 710 A.2d 1129 (Pa. 1998). We begin with *Leet*, wherein the High Court considered whether sheriffs possess the authority to stop motorists for violations of the Vehicle Code. Recounting the history of the sheriff, the High Court noted that "[i]t is a commonplace that in times going back to the Magna Carta, the sheriff was the chief law enforcement officer of the shire or county." *Leet*, 641 A.2d at 302. The Court concluded that "[u]nless the sheriff's common law power to make warrantless arrests for breaches of the peace committed in his presence has been abrogated, it is clear that a sheriff (and his deputies) may make arrests for motor vehicle violations which amount to breaches of the peace committed in their presence." *Id*. at 303. Recognizing the need for those who enforce the Vehicle Code to undergo training equivalent to that of "[p]olicemen, to whom the legislature has given primary responsibility for enforcement of the . . . [V]ehicle [C]ode," the Court clarified that "a sheriff or deputy sheriff would be required to complete the same type of training[.]" *Id*. (footnote omitted). Tellingly, our General Assembly **included** "sheriff vehicle" within the definition of an emergency vehicle authorized to utilize the lights at issue in the case *sub judice*. *See* 75 Pa.C.S. § 102.

In **Roose**, the Court was tasked with determining whether constables possess the authority to stop motorists for violations of the Vehicle Code. Applying the same analysis as **Leet**, the Court held that constables do not possess such authority. First, it noted, "the same sources referred to in **Leet**, which provided a rich history of the common law development of the powers of the sheriff, are silent with reference to the authority of the constable." **Roose**, 710 A.2d at 1130. Thus, the Court was "impressed with what appears to be a significant difference between the duties of sheriffs and constables." **Id**. More importantly, the Court observed that constables did not develop in the common law, but rather from statute:

> Most relevant for our inquiry is the statutory basis for the powers of constables in England. Unlike sheriffs, whose powers grew in the common law tradition to include broad law enforcement authority, the powers of constables were not developed as fully in such a strong common law tradition, but were rather set forth in a series of statutes. Thus it is not appropriate to follow the analysis of **Leet**, wherein we reasoned that sheriffs, due to their common law powers, had the authority to enforce the motor vehicle laws unless contravened by statute; conversely, as to constables, it seems proper to conclude that unless a statute empowers them to enforce the vehicle laws, then they do not possess the legal authority to do so.
>
> We hold, therefore, that due to the absence of statutory authority for constables to enforce the motor vehicle laws, they do not possess such authority, as such authority cannot be derived from the common law as was the case for sheriffs in **Leet**.

**Id**. (citations altered).

We observe that the Supreme Court affirmed our decision in **Roose** based upon a comparison of constables and sheriffs, whereas the Superior

- 21 -

Court panel focused on constables and police officers. Critically, the High Court neither disapproved of nor reversed our conclusions regarding whether constables are police officers and the scope of their authority to utilize red and blue lights pursuant to the Vehicle Code. Indeed, this Court has continued to rely upon our panel decision in *Roose* for the proposition that "the private vehicles of Pennsylvania constables traditionally are not recognized at statute as privileged, official vehicles." *Commonwealth v. Rodriguez*, 81 A.3d 103, 108 n.10 (Pa.Super. 2013) (citation omitted).[6] Furthermore, implicit in our Supreme Court's ruling in *Roose* is the recognition that since constables do not have the power to pull over vehicles, they have no need for red and blue lights.[7]

_____

[6] Similarly, our sister court has echoed the concerns expressed in our *Roose* opinion, notwithstanding the Supreme Court's differing analysis in affirming our decision. *See Ward v. Com., Dep't of Transp., Bureau of Motor Vehicles*, 65 A.3d 1078, 1082-83 (Pa.Commw. 2013).

[7] The dissent posits that constables require these lights to safely perform their duties of directing traffic and issuing orders to motorists. *See* Dissent at 4 n.3. While we do not opine upon whether red and blue lights would make such tasks safer, we question whether they are necessary, as school crossing guards and traffic control flaggers regularly perform similar duties utilizing visibility-enhancing safety gear other than red and blue lights. Interestingly, the dissent notes that red and blue lights are critical for "signaling to a stopped motorist that it is a police officer. . . who is approaching." *Id*. (quoting *Commonwealth v. Livingstone*, 174 A.3d 609, 621 (Pa. 2007)). We agree that the lights are one of the hallmarks of a police vehicle. However, a constable vehicle is not a police vehicle, and a constable is not a police officer. Therefore, such lights have no place on a constable vehicle.

Accordingly, we deem it worthwhile to revisit this Court's detailed analysis in *Roose*, as it provides valuable context for the matter at hand, and our rejection of the interpretation espoused by Appellant and the dissent:

Constables and deputy constables are not employees of any municipal subdivision as police and sheriffs are. They are not paid a salary by any municipal subdivision but rather are independent contractors whose pay is on a per job basis. As independent contractors, they are not acting for or under the control of the Commonwealth and cannot be considered Commonwealth employees in order to receive legal representation when sued in connection with their duties. No one supervises constables in the way a police chief supervises police officers or a sheriff supervises deputies. No municipality is responsible for their actions in the way a city, borough, or township is responsible for its police or a county is responsible for its sheriff's office. In fact, our Supreme Court [in *In re Act 147 of 1990*] found unconstitutional legislation which attempted to place constables under the supervisory authority of the courts.

. . . .

Training for police officers and constables is also vastly different. Constables and deputy constables are required to have only [eighty] hours of basic training, some of which is devoted to the interpretation and application of the fee schedule. Conspicuously absent from the curriculum of the basic training course is enforcement of the Vehicle Code. Police officers are required to take a course of 520 hours of study, [forty] hours of which are devoted to the Vehicle Code.[8] Also mandatory for police officers are minimum physical fitness standards, psychological evaluations and background investigations to determine suitability for employment as a police officer. This training must be satisfactorily completed prior to actually enforcing criminal laws and moving traffic violations. The definition of police officer in the training act notably includes deputy sheriffs of second[-]class counties and housing authority police of first class cities but does not include constables or deputy constables, thus these

_____

[8] As noted hereinabove, the MPOETC has since enlarged those requirements.

requirements do not apply to constables or deputy constables. Deputy sheriffs of second[-]class counties who have successfully completed this training are included in the definition of "police officer" in the Crimes Code. Neither constables nor deputy constables are, however, included in this definition.

*Roose*, 690 A.2d 268, 269-70 (Pa.Super. 1997) (cleaned up).

Further, we hypothesized about the problems that could arise by ascribing police powers to constables, including the very issue before us, *i.e.*, using red and blue lights on their constable vehicles:

[I]s a citizen required to stop when signaled to do so by a constable or deputy constable? The offense of fleeing or attempting to elude a police officer by its very terms is limited to police officers who are in a clearly identifiable police vehicle or, if the vehicle is unmarked, the officer must be in uniform and displaying a badge. Constables and deputy constables do not have uniforms and they are not provided with municipal vehicles but use their own private cars. By what means does a constable or deputy constable signal a driver to stop? Under the Vehicle Code, a constable's private automobile does not fit within the definition of an emergency vehicle, and is not within that class of vehicles which may display flashing red or blue lights or use sirens. If a constable or deputy constable violates someone's constitutional rights, is there "state action"? What if a constable or deputy constable is injured or killed while making a traffic stop? Since there is no employer, there would be no workers' compensation coverage, leaving the injured constable to pay any expenses.

A more serious problem with motor vehicle stops is the possibility of pursuit. If the motorist refuses or fails to stop, will the constable feel compelled to instigate a chase which might endanger innocent bystanders? The General Assembly recently passed legislation requiring each municipal police department to establish policies and guidelines to be followed by officers when engaging in motor vehicle pursuits as defined by the Vehicle Code. The policies must include criteria for deciding when to initiate a pursuit including the potential for harm to others, the seriousness of the offense, safety factors posing a risk to the general public, responsibilities of the various parties, including officers,

supervisors and communications centers, pursuit tactics, roadblock usage, and communications during interjurisdictional pursuit. It is clear that these regulations contemplate that **only** properly trained and supervised police officers would be involved in such pursuits. This legislation evidences the legislature's intent to control high speed pursuits to provide for the safety of both the participants and the general public who may simply be in the path of the pursuit. Constables and deputy constables are not part of any municipal police force and are not supervised in the manner that this statute presumes. Yet if we grant constables and deputy constables a common law right to stop vehicles, doesn't this also include allowing them to pursue a fleeing vehicle or at least allow for the possibility that they will feel authorized to do so? Absent explicit statutory authority from the General Assembly, we hesitate to bestow such unbridled power on someone who is, as discussed below, not trained to handle such a situation.

*Id*. (cleaned up, emphasis in original). Ultimately, we noted that the constable in that case "was himself in violation of the . . . Vehicle Code for using flashing lights and a siren on a vehicle which was not authorized as an emergency vehicle under the [Vehicle] Code." *Id*. at 270 n.2.

Based on the foregoing, even if the Vehicle Code did not plainly provide that constable vehicles are not one of the enumerated vehicles which may equip red and blue lights, we would not be persuaded by Appellant's arguments to deviate from our concerns expressed in the panel decision in *Roose*. Read "in the light of reason and common sense," § 4571(b)(1) intended to limit the usage of red and blue lights to those vehicles operated by officials with either the authority to stop motorists or a particular responsibility in responding to serious emergencies. *See Vellon*, 292 A.3d at 890 (cleaned up); 75 Pa.C.S. § 4571 (limiting the usage of red and blue lights to "police, sheriff, coroner, medical examiner or fire police vehicles").

Constables lack the authority to do either. Permitting constables to affix red and blue lights would cause confusion to motorists and bystanders, blurring the distinction between those who have the authority to act and aid as police officers, and those who lack such authority but are operating in what purports to be an authoritative vehicle. Thus, for purposes of § 4571, a constable is not a police officer, and a constable vehicle is not a police vehicle. Accordingly, Appellant is not entitled to relief on his first issue.

Appellant next argues that § 4571(b)(1) is void for vagueness because it is subject to two "legally correct ways to read it[.]"[9] Appellant's brief at 30. We review such a challenge *de novo*. *See Commonwealth v. Davidson*, 938 A.2d 198, 203 (Pa. 2007). The principles governing a void-for-vagueness claim are well-settled:

> Under the void-for-vagueness standard, a statute will only be found unconstitutional if the statute is so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application. However, a statute will pass a vagueness constitutional challenge if the statute defines the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. Due process requires that a criminal statute give fair warning of the conduct it criminalizes. Furthermore, even if the General

---

[9] The Commonwealth avers that this issue is waived because Appellant did not include it in his Rule 1925(b) statement. *See* Commonwealth's brief at 7. Rather than directing us to where in the statement he preserved it, Appellant merely retorts that "he did." Appellant's reply brief at 1. While his concise statement could have benefited from a clearer indication that he was challenging the vagueness of § 4571, the trial court interpreted it to include such a claim and addressed it. *See* Trial Court Opinion, 7/7/23, at unnumbered 2-5. Accordingly, we decline to find waiver.

Assembly could have chosen clearer and more precise language equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted is unconstitutionally vague.

*Id*. at 207–08 (cleaned up).

Here, the Vehicle Code clearly lists which vehicles may utilize red and blue lights. As indicated, constable vehicles are not specified as one of those, and while Appellant has interpreted the statute differently than this Court, the trial court, the MDJ, and Trooper Bown-Shields, that does not mean that it has two equally plausible readings. A commonsense interpretation of the plain language of the Vehicle Code provides notice to lay individuals that, unless they are operating one of the emergency vehicles explicitly listed, they may not equip red and blue lights on their vehicles.[10] The legislature was not required to add language explaining which vehicles were **prohibited** when it clearly delineated which ones were **permitted**. Since the statute is not vague, this claim fails.

In his third issue, Appellant avers that he was convicted under the wrong subsection of § 4571. **See** Appellant's brief at 34. Specifically, he contends that he was improperly charged with § 4571(a) and convicted of a violation of § 4571(b)(1), when he should have been charged and convicted of § 4571(d). To refresh, these subsections provide as follows:

---

[10] We acknowledge that the dissent agrees with Appellant's reading of § 4571. While respecting our colleague's reasoning and conclusions, we cannot join in that interpretation, and we do not find that this difference in opinion renders the statute vague.

**(a) General rule.--**Every emergency vehicle shall be equipped with one or more revolving or flashing red lights and an audible warning system.  Spotlights with adjustable sockets may be attached to or mounted on emergency vehicles.

**(b) Police, sheriff, fire and coroner or medical examiner vehicles.--**
(1) Police, sheriff, coroner, medical examiner or fire police vehicles may in addition to the requirements of subsection (a) be equipped with one or more revolving or flashing blue lights.  The combination of red and blue lights may be used only on police, sheriff, coroner, medical examiner or fire police vehicles.

. . . .

**(d) Vehicles prohibited from using signals.--**Except as otherwise specifically provided in this section, no vehicle other than an emergency vehicle may be equipped with revolving or flashing lights or audible warning systems identical or similar to those specified in subsections (a) and (b).  A person who equips or uses a vehicle with visual or audible warning systems in violation of this section commits a summary offense and shall, upon conviction, be sentenced to pay a fine of not less than $500 nor more than $1,000.

75 Pa.C.S. § 4571.  In addition to the discrepancy between the charging document and his conviction, Appellant maintains that he could only be convicted of subsection (d) because that is the provision that prohibited the relevant conduct.  *See* Appellant's brief at 35-37.

By way of background, Appellant was cited with a violation of subsection (b)(1) and convicted at the same subsection following a *de novo* appeal. Therefore, any complaint about the validity of his summary conviction before the MDJ was nullified by his appeal to the Court of Common Pleas for a trial *de novo*.

As for whether Appellant should have been charged with § (d) instead of (b)(1), we agree with the trial court's explanation of the interplay between the relevant subsections: "[I]t's clear [§ 4571(d)] is what happens if you are convicted or in violation of [§] 4571(b)(1)." N.T. Summary Appeal, 4/3/23, at 44. Based on the foregoing, we discern no error in Appellant being charged with violating § 4371(b)(1) as he equipped red and blue lights to a vehicle that lacked statutory authorization. Having violated § 4571(b), the grading of his offense and the parameters of his punishment were set forth in § 4571(d). No relief is due.

Finally, Appellant challenges the sufficiency of the evidence to sustain his conviction because he contends that there was no evidence that the light bar, which was clear when not illuminated, contained red and blue lights. *See* Appellant's brief at 38-40. He maintains that the lights were never activated and the trooper's testimony indicated he was unsure whether he had observed the color of the lights. *Id*. at 39.

We review a claim challenging the sufficiency of the evidence pursuant to these well-established legal principles:

> When reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the Commonwealth as the verdict winner in order to determine whether the jury could have found every element of the crime beyond a reasonable doubt. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. Additionally, this Court cannot re-weigh the evidence and substitute our judgment for that of the fact-finder. This presents

a pure question of law and, as such, our standard of review is *de novo*, and our scope of review is plenary.

***Commonwealth v. Santiago***, 294 A.3d 482, 484–85 (Pa.Super. 2023) (cleaned up).

While understandably not without some qualification due to the intervening two years, Trooper Brown-Shields testified that it was his recollection that he permitted Appellant to turn on his lights during the traffic stop and that, when he did so, it confirmed that the lights were red and blue. Additionally, the trooper attested that Appellant conceded the light bar contained red and blue lights, and that he was permitted to have them.

Although it is unclear from the audio recording whether Appellant in fact turned on his lights during the stop, the recording confirms that the trooper gave him the option to turn on his lights so he would feel less embarrassed about being pulled over in his constable vehicle. Nothing in the recording contradicts the trooper's testimony that Appellant opted to turn on his lights.

More importantly, though, the audio recording corroborated the trooper's testimony that Appellant himself conceded the color of the lights. As noted at the outset, Appellant stated during his conversation with Trooper Brown-Shields that the PSP had previously seized the same vehicle for having red and blue lights. He explained that he was cited for a violation of § 4571, but the citation was ultimately dismissed and the vehicle returned to him with the red and blue lights still affixed. Appellant boasted that when asked to remove the lights thereafter, he refused to do so because he had won the case, thereby confirming that the lights were still the same red and blue ones.

*See* Exhibit D-2 at 7:45-9:08. Indeed, Appellant reported that whenever there is a disabled vehicle on the road or he observes a breach of the peace and the troopers are not on scene, "my lights are on." *Id*. at 21:20-21:35. At no point did Appellant deny that his lights were red and blue. Rather, he emphatically insisted throughout the encounter that he was entitled to have red and blue lights on his vehicle because he was a police officer.

Viewing this evidence in the light most favorable to the Commonwealth, we conclude that there was sufficient evidence to prove that Appellant's light bar emitted red and blue flashing lights in violation of § 4571(b)(1). Accordingly, Appellant's sufficiency challenge fails.

In light of the foregoing, we discern no reason to overturn Appellant's summary conviction. Therefore, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judge Murray joins.

Judge Stabile files a Dissenting Opinion.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/6/2025